

**IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT**
**IN AND FOR HILLSBOROUGH COUNTY, STATE OF FLORIDA**
**CIVIL DIVISION**

FILED

03 OCT -2 PM 4: 05

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

STEVEN AISENBERG and
MARLENE AISENBERG,

03    8320

    Plaintiffs,

CASE NO.:

v.

**DIVISION H**

HILLSBOROUGH COUNTY SHERIFF'S
OFFICE, STEPHEN KUNZ, RACHELLE DESVAUX
BEDKE, LINDA BURTON, WILLIAM BLAKE,
CAL HENDERSON, GARY TERRY, ROBERT
BULLARA, GREG BROWN, DON ROMAN,
CARLOS SOMELLAN, JUSSARA
OLMEDA, CHAD CHRONISTER, PHILLIPPE
DUBORD, MIGUEL DIAZ, FERNANDO
ENRIQUEZ, ALFRED FORD, LESTER ORGERON,
MICHAEL BRYANT, BILLY WILLIAMS
ANTHONY PELLICANO,

RECEIPT OF FILING
SEP 0 8 2003
CLERK OF CIRCUIT COURT

    Defendants.

              /

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

1.    This is an action for damages in excess of Fifteen Thousand and 00/100 Dollars ($15,000.00), exclusive of interest, attorney's fees and costs and comes within the jurisdiction of this Court.

2.    The events giving rise to this cause of action occurred in Hillsborough County, Florida.

1

PL

3.     This is an action for money damages for the extraordinary injuries suffered by Plaintiffs Steven Bennett Aisenberg and Marlene Joy Aisenberg as the result of a conspiracy among several law enforcement officers and federal prosecutors who attempted to frame these two innocent people. Following the disappearance of infant girl, Sabrina Paige Aisenberg, on November 24, 1997, the Defendants conspired together to improperly manufacture evidence against the Plaintiffs and, acting on the unsubstantiated suspicion that the Plaintiffs were responsible for Sabrina's disappearance, resorted to a series of illegal and unconstitutional investigative procedures. In furtherance of the conspiracy, the Defendants, individually and in concert, engaged in (1) unlawful and unconstitutional electronic surveillance of the Plaintiffs, including the submission of patently false and misleading evidence to a judge in order to delude that judge into granting permission to surreptitiously intercept the Plaintiffs' conversations, (2) improper attempts to instigate and influence an investigation by the Florida Department of Health and Rehabilitative Services for unfounded allegations of abuse to the Plaintiffs' children, (3) serious abuses of the grand jury process causing that investigative body to wrongly accuse innocent individuals, to defame them, and otherwise violate their rights to privacy by submitting false information, testimony and evidence during the investigative stages of the grand jury, (4) fabricating evidence concerning the Aisenbergs' intercepted communications by intentionally or recklessly drafting false and misleading transcripts of conversations that the Defendants reasonably believed would be used as evidence before the grand jury and trial court; (5) hiring purported "expert" Anthony Pellicano to fabricate transcripts of those same conversations; legitimize prior misrepresentations and suborn perjury; (6) malicious prosecution of Plaintiffs on federal conspiracy and false statement charges, (7) dissemination of false and defamatory information about the Plaintiffs to the press, the public and to state investigating

2



agencies with the intent to violate Plaintiffs' rights under federal and state law and to cause them serious harm; and (8) creation of a policy, practice or procedure to violate the Aisenbergs' constitutional rights.

4.     As a result of these unlawful and unconstitutional acts, the Plaintiffs were recklessly and corruptly indicted, arrested and prosecuted for federal conspiracy and false statement violations. The criminal charges were dismissed on February 22, 2001, following hearings on governmental misconduct in the use of electronic surveillance of the Plaintiffs.

5.     Throughout the investigation and prosecution of the Aisenbergs, Defendants Henderson, Terry and other supervisors of the Hillsborough County Sheriff's Office showed a deliberate indifference towards the Aisenbergs' plight by willfully closing their eyes and consciously avoiding learning the truth about Defendants Burton and Blake's conduct.

## PARTIES

6.     Plaintiff STEVEN AISENBERG was at all relevant times a resident of Hillsborough County, Florida.

7.     Plaintiff MARLENE AISENBERG was at all relevant times a resident of Hillsborough County, Florida.

8.     Defendant HILLSBOROUGH COUNTY SHERIFF'S OFFICE (HCSO) is a local government entity in the State of Florida and the employer of Defendants Blake, Burton, Terry, Burton, Brown, Bullara, Roman, Somellan, Olmeda, Dubord, Diaz, Enriquez, Ford, and Orgeron.

9.     Defendant STEPHEN KUNZ was at all relevant times an Assistant United States Attorney in the Office of the United States Attorney for the Middle District of Florida. Upon information and belief, Defendant Kunz was at all relevant times a resident of Hillsborough County,

3





Florida. All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Kunz is named in Count II for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by aiding and abetting the making of material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count IV for violating Plaintiff's Fourth and Fifth Amendment rights to due process of law for maliciously prosecuting Plaintiffs by fabricating evidence for to the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; and Count X for intentional infliction of emotional distress.

10.    Defendant RACHELLE DESVAUX BEDKE was at all relevant times an Assistant United States Attorney in the Office of the United States Attorney for the Middle District of Florida. Upon information and belief, Defendant Bedke was at all relevant times a resident of Hillsborough County, Florida.   All acts of the Defendant alleged herein were within the course and scope of her authority and the course of her employment and the Defendant is being sued in her individual capacity for those acts. Defendant Bedke is named in Count II for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by aiding and abetting the making of material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count IV for violating Plaintiffs' Fourth and Fifth Amendment rights to due process of law for maliciously prosecuting Plaintiffs by fabricating evidence for presentation to the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; and Count X for intentional infliction of emotional distress.

PL

11. Defendant LINDA BURTON was at all relevant times a detective in the Hillsborough County Sheriff's Office. Upon information and belief, Defendant Burton was at all relevant times a resident of Hillsborough County, Florida. All acts of the Defendant alleged herein were within the course and scope of her authority and the course of her employment and the Defendant is being sued in her individual capacity for those acts. Defendant Burton is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by causing material misrepresentations to be made in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation to the grand jury and to the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count IX for malicious prosecution; and Count X for intentional infliction of emotional distress.

12. Defendant WILLIAM BLAKE was at relevant times a detective in the Hillsborough County Sheriff's Office. Upon information and belief, Defendant Blake was at all relevant times a resident of Hillsborough County, Florida. All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Blake is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by causing material misrepresentations to be made in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiff's Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before to the grand jury and to the trial court; Count V for conspiracy to violate the

5



Aisenbergs' civil rights;  Count IX for malicious prosecution; and Count X for intentional infliction of emotional distress.

13.    Defendant SHERIFF CAL HENDERSON was at all relevant times the Sheriff of Hillsborough County.  Upon information and belief, Defendant Henderson was at all relevant times a resident of Hillsborough County, Florida.  All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual and official capacities for those acts. Defendant Henderson is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by aiding and abetting the making of material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count VI for instituting a policy, practice and procedure which deprived the Plaintiffs of their due process rights; Count VII for failing to train and/or supervise the employees of the Hillsborough County Sheriff's Office; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

14.    Defendant GARY TERRY was at all relevant times a Major in the Hillsborough County Sheriff's Office.  Upon information and belief, Defendant Terry was at all relevant times a resident of Hillsborough County, Florida.  All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual and official capacities for those acts. Defendant Terry was the Task Force Commander in charge of the HCSO investigation into the disappearance of Sabrina Aisenberg.

PL



Defendant Terry is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by making material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count VI for instituting a policy, practice and procedure which deprived the Plaintiffs of their due process rights; Count VII for failing to train and/or supervise the employees of the Hillsborough County Sheriff's Office; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

15.    Defendant ROBERT BULLARA was at all relevant times a Sergeant in the Hillsborough County Sheriff's Office.  Upon information and belief, Defendant Bullara was at all relevant times a resident of Hillsborough County, Florida. All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Bullara is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by making material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count VII for failing to train and/or supervise the employees of the Hillsborough County Sheriff's Office; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

PL



16.     Defendant GREG BROWN was at all relevant times a Lieutenant in the Hillsborough County Sheriff's Office.  Upon information and belief, Defendant Brown was at all relevant times a resident of Hillsborough County, Florida.  All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Brown is named in Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

17.     Defendant DON ROMAN was at all relevant times a Corporal in the Hillsborough County Sheriff's Office.  Upon information and belief, Defendant Roman was at all relevant times a resident of Hillsborough County, Florida.  All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Roman is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by making material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

PL



18.     Defendant CARLOS SOMELLAN was at all relevant times a detective and polygrapher in the Hillsborough County Sheriff's Office. Upon information and belief, Defendant Somellan was at all relevant times a resident of Hillsborough County, Florida. All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Somellan is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by making material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment Rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

19.     Defendant JUSSARA OLMEDA was at all relevant times a Deputy in the Hillsborough County Sheriff's Office. Upon information and belief, Defendant Olmeda was at all relevant times a resident of Hillsborough County, Florida. All acts of the Defendant alleged herein were within the course and scope of her authority and the course of her employment and the Defendant is being sued in her individual capacity for those acts. Defendant Olmeda is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by making material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate

9

PL



the Aisenbergs' civil rights; Count IX for malicious prosecution; Count X for intentional infliction of severe emotional distress.

20.     Defendant PHILLIPPE DUBORD was at all relevant times a Deputy in the Hillsborough County Sheriff's Office. Upon information and belief, Defendant Dubord was at all relevant times a resident of Hillsborough County, Florida. All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Dubord is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by making material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

21.     Defendant CHAD CHRONISTER was at all relevant times a Deputy in the Hillsborough County Sheriff's Office. Upon information and belief, Defendant Chronister was at all relevant times a resident of Hillsborough County, Florida. All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Chronister is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by making material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs'

10

PL



Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

22.    Defendant MIGUEL DIAZ was at all relevant times a Deputy in the Hillsborough County Sheriff's Office.  Upon information and belief, Defendant Diaz was at all relevant times a resident of Hillsborough County, Florida.  All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Diaz is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by making material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

23.    Defendant FERNANDO ENRIQUEZ was at all relevant times a Deputy in the Hillsborough County Sheriff's Office.  Upon information and belief, Defendant Enriquez was at all relevant times a resident of Hillsborough County, Florida.  All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Enriquez is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches

11



and seizures by making material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

24. Defendant ALFRED FORD was at all relevant times a Deputy in the Hillsborough County Sherfiff's Office. Upon information and belief, Defendant Ford was at all relevant times a resident of Hillsborough County, Florida. All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Ford is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by making material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

25. Defendant LESTER ORGERON was at all relevant times a Deputy in the Hillsborough County Sheriff's Office. Upon information and belief, Defendant Orgeron was at all relevant times a resident of Hillsborough County, Florida. All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the

PL

Defendant is being sued in his individual capacity for those acts. Defendant Orgeron is named in Count I for violating the Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures by making material misrepresentations in the application and extensions for an order permitting the interception of the Plaintiffs' oral communications; Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; Count V for conspiracy to violate the Aisenbergs' civil rights; Count IX for malicious prosecution; and Count X for intentional infliction of severe emotional distress.

26.    Defendant MICHAEL BRYANT was at all relevant times a Deputy in the Hillsborough County Sheriff's Office. Upon information and belief, Defendant Bryant was at all relevant times a resident of Hillsborough County, Florida. All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Bryant is named in Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by fabricating evidence for presentation before the grand jury and the trial court; and Count V for conspiracy to violate the Aisenbergs' civil rights.

27.    Defendant BILLY WILLIAMS was at all relevant times a Deputy in the Hillsborough County Sheriff's Office. Upon information and belief, Defendant Williams was at all relevant times a resident of Hillsborough County, Florida. All acts of the Defendant alleged herein were within the course and scope of his authority and the course of his employment and the Defendant is being sued in his individual capacity for those acts. Defendant Williams is named in Count III for violating Plaintiffs' Fourth and Fourteenth Amendment rights by maliciously prosecuting the Plaintiffs by

13

## INVESTIGATION

34.    Within minutes, HCSO Deputy Curtis Warren responded to the Aisenbergs' home.

35.    Shortly thereafter, Defendants Blake and Burton arrived at the Aisenberg home.

36.    As part of the investigation into Sabrina's disappearance, a multi-jurisdictional task force, known as the "Sabrina Task Force", was set up:

A.    The task force commander was Defendant Terry of the HCSO.

B.    The HCSO was designated "lead" investigative agency.  Defendants Linda Burton and William Blake were co-lead detectives;

C.    The Federal Bureau of Investigation (FBI) and Florida Department of Law Enforcement (FDLE) also became involved in the investigation into Sabrina's disappearance; and

D.    Defendants Kunz and Bedke advised and helped direct the Sabrina Task Force.

37.    Within the first hours of Sabrina's disappearance, investigators told Marlene Aisenberg that they believed she was responsible for Sabrina's disappearance.

38.    Notwithstanding these  allegations, the Aisenbergs cooperated fully with the investigation, including but not limited to:

A.    The Aisenbergs, upon request of investigators, consented to a search of their home and granted the investigators full and unbridled access to the entire residence and curtilage;

B.    The Aisenbergs, upon request of investigators, allowed investigators to interview their other children, William and Monica;

C.    The Aisenbergs, upon request of investigators, permitted investigators to place a "trap and trace" device on their home phone;

D.    The Aisenbergs, upon request of investigators, provided hair and blood samples on multiple occasions;

15

PL



E.    The Aisenbergs, upon request of investigators, provided all information requested, including lists of Playtime Pal customers, M/I Homes employees, friends and family;

F.    Marlene Aisenberg, upon request of investigators, gave Defendant Burton her address book which contained the phone number of every family member and friend of the Aisenbergs;

G.    The Aisenbergs, upon request of investigators, permitted their cars to be impounded and searched by investigators for fingerprinting and inspection;

H.    The Aisenbergs, upon request of investigators, provided pictures of Sabrina to investigators;

I.    The Aisenbergs, upon request of investigators, turned over a videotape of Sabrina taken on November 22, 1997 by Marlene Aisenberg;

J.    The Aisenbergs provided investigators with Sabrina's clothes and toys;

K.    On or about November 30, 1997, the Aisenbergs met with investigators for over three hours, offering to and answering any questions the investigators had - the entire conversation was recorded and a transcript of the meeting was provided to investigators;

L.    On or about December 3, 1997, the Aisenbergs, upon request of investigators, met with investigators;

M.    The Aisenbergs, upon request of investigators, permitted investigators to take carpet samples of the different rooms in the house;

N.    On or about December 8, 1997, Marlene Aisenberg, upon request of investigators, discussed the timeline she provided during the December 3, 1997 interview;

O.    On or about February 13, 1998, the Aisenbergs, upon request of investigators, met with Defendant Bullara and Defendant J.R. Burton;

P.    On or about June 5, 1998, the Aisenbergs, upon request of investigators, met with individuals from the HCSO;

Q.    On or about October 8, 1998, the Aisenbergs, upon request of investigators, met with individuals from the HCSO;

16

PL



R.      On or about October 19, 1998, the Aisenbergs, upon request of investigators, allow investigators to take dirt samples from the front and back yards of their residence;

S.      In late January 1998, the Aisenbergs told Defendant Terry that they would sit with investigators and answer any questions posed as long as the interview was recorded and counsel was present; and

T.      In late January 1998, the Aisenbergs informed Defendants Kunz and Bedke that they would sit with investigators and answer any questions posed as long as the interview was recorded and counsel was present.

39.     For the next two days, the Aisenbergs were questioned extensively by investigators.

40.     On or about November 24, 1997, Plaintiffs submitted to polygraph examinations.

A.      After taking his exam, Steven Aisenberg was informed that he had passed.

B.      Investigators informed Marlene Aisenberg that her test was inconclusive as the trauma of losing her daughter did not permit a valid examination. Investigators told her they would attempt another polygraph examination a week later, after she had calmed down.

41.     On the afternoon of November 25, 1997, investigators' questioning of the Aisenbergs became more hostile and accusatory.

42.     In response, the Aisenbergs contacted a lawyer to discuss their legal rights. An appointment was scheduled for the morning of November 26, 1997.

43.     Upon learning that the Aisenbergs were meeting with a lawyer the next morning, Defendants Burton and Blake asked Marlene Aisenberg to immediately submit to another polygraph examination, despite the fact that they knew a valid polygraph examination still could not be performed.

44.     After Marlene Aisenberg agreed and submitted to the second polygraph examination; she was again told the results were inconclusive.

17

PL



45.    In view of the increasingly hostile and accusatory nature of the Defendants' attitude toward the Aisenbergs, certain restrictions, including the requirement that their attorney be present, were imposed as a condition of future interviews of the Plaintiffs.

46.    Notwithstanding these express limitations, Defendants Burton and Blake repeatedly attempted to question the Aisenbergs outside the presence of the Aisenbergs' counsel.

47.    As a result of the investigators' immediate and unfounded conclusion that the Aisenbergs were responsible for the disappearance of Sabrina, investigators failed to engage in the most basic of investigatory techniques, such as:

A.    Defendants failed to properly secure and investigate the crime scene;

B.    Defendants failed to take fingerprint for approximately three days;

C.    Defendants failed to seal off Sabrina's room;

D.    Defendants failed to obtain a sample of Sabrina's clothing for tracking dogs brought in as part of the investigation;

E.    Defendants failed to preserve Sabrina's crib and contents until four days after her disappearance; and

F.    Defendants failed to collect the clothing worn by Steven and Marlene Aisenberg the night and morning of Sabrina's disappearance for five days, after they had been washed.

48.    Defendants ignored evidence which proved the Aisenbergs' innocence and conducted their investigation in a biased manner designed only to "create" evidence of the Aisenbergs' guilt. For example,

A.    Defendants Burton and Blake showed various witnesses pictures of Sabrina and suggested, in an attempt to improperly influence the witnesses, that the pictures proved Sabrina had been physically abused. When the witnesses disagreed with the Defendants' assessment, their testimony was disregarded or criticized.

18

PL

B.    Defendants questioned witnesses in a manner designed to communicate their unfounded belief that the Aisenbergs were guilty of a crime. For example,

1.    Defendants told certain witnesses that they was only interviewing them to "appease" the Aisenbergs' attorney.

2.    In following potential leads, Defendant Burton left one witness a voice message, "I just need to know what you were doing on Sunday after the birthday party, just to, you know, clear you out, because you have been listed as a now alleged suspect by the Aisenbergs."

3.    Defendants routinely interviewed witnesses in a perfunctory, irresponsible manner. Instead of seeking information relevant to their investigation, they merely asked ridiculous questions, such as "Did you take the baby?"

49.    Defendants and other investigators repeatedly intimidated and harassed witnesses who offered evidence pointing to the guilt of persons other than the Aisenbergs. For example, certain defendants, including but not limited to Defendants Terry and Bullara, disregarded with disgust and antipathy many witnesses who had reported seeing children who looked like Sabrina in other cities and locations suggesting a "why are you bothering me?" attitude which is consistent with the lack of objectivity in the investigation and the Defendants' intent to frame the Aisenbergs.

50.    On several occasions, Defendants Henderson and Terry were notified that investigators were predisposed to consider only the Aisenbergs responsible for Sabrina's disappearance and were manipulating witnesses, fabricating evidence and ignoring legitimate leads. Defendants Henderson and Terry did nothing to correct these manipulative investigative practices.

## APPLICATIONS FOR ELECTRONIC
## INTERCEPTION OF AISENBERGS' ORAL COMMUNICATIONS

51.    Frustrated by their inability to obtain facts to support their conclusion that the Aisenbergs were involved in Sabrina's disappearance, Defendants Blake and Burton submitted an

19

PL



Application for the Interception of Oral Communications on December 12, 1997 to a State Circuit Judge (the "Original Application").

52.    The Original Application was approved and listening devices were placed in the marital bedroom and the kitchen of the Aisenberg home pursuant to Electronic Surveillance Order 97-4.

53.    Upon information and belief, the decision to apply for the Original Application was made after consultation with Defendants Henderson, Terry, Bullara, Kunz and Bedke.

54.    On or about January 9, 1998, Defendants Burton and Blake sought an extension of the Original Application  (the "First Extension").

55.    On or about February 11, 1998, Defendants Burton and Blake sought a second extension of the Original Application (the "Second Extension").

56.    The Second Extension was drafted by Defendant Roman based on "facts" provided by Defendants Burton and Blake.

57.    The Original Application and subsequent extension requests sought permission to intercept oral communications "which will concern and be evidence of offenses involving Homicide, Sale of a Minor Child, Child Neglect with Great Bodily Harm, and Aggravated Child Abuse in violation of Florida Statutes, Chapters 782.04, 63.212D, 827.03(3) and 827.03 (2), which has been committed, are being committed, or will be committed by the [Aisenbergs]."

58.    The determination of what offenses to be included in the Original Application was made by Defendants Blake, Burton, Terry, Bullara, and HCSO Corporal William Knowles.

59.    Of the crimes listed in the Original Application, only homicide is permissible predicate offense under the Florida Wiretap statute for authority to intercept oral communications.

20



60.    Defendants Burton and Blake were ultimately responsible for the drafting and completion of transcripts that were used as exhibits to the First and Second Extensions prepared from conversations intercepted by the oral intercept.

    A.    Each listening device was recorded on three tape recorders simultaneously. One recording was sealed and filed with the court. One recording was designated State Attorney's Office. The third recording was the "working copy" tapes which was used by the monitors to identify pertinent conversations and develop the transcripts. The "work copy" had been previously used in other investigations and were of poor quality.

    B.    After a conversation was deemed pertinent, the monitor who identified the conversation either prepared a transcript or asked another monitor to prepare a transcript.

    C.    The recordings and transcripts were reviewed by Defendants Burton and Blake who added their changes and modifications so that the transcripts would reflect what they supposedly heard.

61.    The monitors, after receiving input from Defendants Burton and Blake, prepared summaries of the conversations which were provided to Defendants Burton and Blake as well as Corporal Knowles and Defendant Roman.

62.    Defendants Burton and Blake provided these summaries to the reviewing judge in the ten day reports and as specific allegations in the First and Second Extension Applications.

63.    The transcripts of allegedly pertinent conversations reviewed and approved by Defendants Burton and Blake were attached to the First and Second Extension Applications as exhibits.

21

PL

## MISREPRESENTATIONS IN ORIGINAL APPLICATION

64. Throughout the Original Application, Defendants Burton and Blake intentionally or recklessly misrepresented numerous material facts and omitted facts which would have materially affected allegations contained in the Original Application. For example:

A.    The allegation that Marlene Aisenberg was speaking to an "unknown party" during the 911 call was an intentional or reckless misrepresentation as Defendants Burton and Blake knew that Marlene Aisenberg was speaking to her mother during the call. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

B.    The allegation that Marlene Aisenberg sounded "calm and having her thoughts collected" on the 911 call was an intentional or reckless misrepresentation as Defendants Burton and Blake knew that she was hysterical and crying throughout the call. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

C.    The allegation that Deputy Warren observed that "neither party appeared to be very upset" was an intentional or reckless misrepresentation as Defendants Burton and Blake omitted the fact that several witnesses who saw the Aisenbergs that morning stated the Aisenbergs were visibly upset over their daughter's disappearance. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

D.    The allegation that investigators "thoroughly checked all possible entries/exits at the residence and found no signs of forced entry" was an intentional or reckless misrepresentation as Defendants Burton and Blake failed to disclose the fact the Aisenbergs had not locked any doors and had left their garage door open on the night of Sabrina's disappearance. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

E.    The allegations that there were only "six (6) jars of baby food and one half (½) box of dry formula mix in the residence" which was insufficient to care for Sabrina was an intentional or reckless misrepresentations as Defendants Burton and Blake knew there was more than enough food to provide for Sabrina. The allegation was made for the purpose of deceiving the court and

22

PL

inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

F.    The allegation that here were only "four (4) unused diapers located in the residence" was a reckless or deliberate misrepresentation as Defendants Burton and Blake knew that a HCSO video of the Aisenberg residence taken within days of Sabrina's disappearance shows many diapers in Sabrina's room. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

G.    The allegation that after an "extensive neighborhood survey . . . no unusual activity was noted or reported" was an intentional or reckless misrepresentation as Defendants Burton and Blake knew that there were numerous complaints by neighbors of attempted break-ins, sounds of automobiles during the night and the report of the sounds of a baby crying early in the morning. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

H.    The allegation that Marlene Aisenberg's interviews display evidence of inconsistent facts is an intentional or reckless misrepresent as Defendants Burton and Blake knew that the summary of interviews of Marlene Aisenberg reveal no such inconsistencies. In addition, the summaries improperly identify the persons conducting the interviews and the contents of the interviews. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

I.    The allegation that Marlene Aisenberg "often" referred to Sabrina in the past tense is an intentional or reckless misrepresentation. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

J.    The allegation that there was "nothing out of order" and there was no "indication that any unknown intruder had been" in the Aisenbergs' residence was an intentional or reckless misrepresentation as Defendants Burton and Blake failed to disclose that there was an unidentified hair found in Sabrina's crib, there were at least seven unidentified fingerprints found throughout the Aisenbergs' home, and there was an unidentified foot print found on the Sabrina's crib dust ruffle. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

23

PL



K.    The allegation that "Brownie barked at everyone who entered the residence except the parents" was an intentional or reckless misrepresentation as Defendants Burton and Blake knew that several witnesses reported that Brownie did not bark at everyone who entered the home. In addition, a video taken by investigators three days after Sabrina's disappearance clearly show Brownie not barking at the videographer as he enters the residence. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

L.    The allegation that there were no pictures of Sabrina in the Aisenbergs' possession was an intentional or reckless misrepresentation as Defendants Burton and Blake knew that the Aisenbergs had pictures of Sabrina in the home and had taken a video of Sabrina the day before her disappearance. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

M.    The allegation that the Aisenbergs were disinterested in the status of the investigation was an intentional or reckless misrepresentation because Defendants Burton and Blake knew the Aisenbergs were apprised on a daily basis of the progress of the investigation. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

N.    The allegation that the only time that information was passed between affiants and Aisenbergs was when affiants initiated contact was an intentional or reckless misrepresentation as Defendants Burton and Blake knew that the Aisenbergs and their attorneys frequently contacted investigators to provide information about potential leads and other matters. The allegation was made for the purpose of deceiving the court and inducing it to authorize a wiretap in the home of Steven and Marlene Aisenberg.

65.    In Section VI of the Original Application, the Defendants asserted that there were no reasonable investigative procedures which could be pursued to assist in solving the crime so that there was no option to resort to surreptitious interception of the Aisenbergs' private communications. This statement was a knowing and intentional falsehood as the Defendants failed to give the reviewing judge a full and complete statement of their investigative efforts which, if they had, would have likely resulted in the Original Application being denied.

24

PL



## MISREPRESENTATIONS IN THE FIRST EXTENSION

66. Throughout the First Extension, Defendants Burton and Blake intentionally or recklessly misrepresented numerous material facts and omitted facts which would have materially affected statements made in the First Extension.

67. Upon information and belief, Defendants Kunz and Bedke had knowledge of these intentional misrepresentations and promoted these falsehoods in their effort to falsely inculpate the Plaintiffs and manufacture a criminal case against them.

68. Defendants Burton, Blake and Diaz intentionally or recklessly misrepresented the audibility, content and context of Paragraph 5 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

        A. In paragraph 5 of the First Extension Defendants Burton, Blake and Diaz alleged that:

> "On December 13, 1997 at approximately 10:57 p.m., a conversation was intercepted on the listening device located in the master bedroom (P-1, conversation number 22). Steven Bennett Aisenberg and Marlene Joy Aisenberg were conversing and during the conversation Steven Bennett Aisenberg stated 'You think I did that?' Marlene Joy Aisenberg then advised 'You been acting weird every night.' Steven Bennett Aisenberg asked 'You think (possibly Tina) behind it.' and Marlene Joy Aisenberg replied 'Uhuh.' It should be noted that this recording is of poor quality. It was also noticed that Marlene Aisenberg was upset and crying during this conversation. Later in the conversation a discussion of figures took place and Marlene Joy Aisenberg asked 'About how much is the set amount (inaudible).' Steven Bennett Aisenberg replied '(inaudible) about (one-hundred or nine-hundred) thousand.' (See Exhibit B)"

        B. This conversation was originally monitored by Defendant Enriquez. The original transcript of the conversation was prepared by Defendant Diaz.

25

PL



C.    This conversation is largely unintelligible. The speakers' voices are mostly distorted and muffled and noises, such as hissing, mechanical humming and wire interference (telephone ringing in the background), permeate the recording.

69.    Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, contents and context of Paragraph 6 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.    Defendants Burton, Blake and Olmeda alleged that during a conversation:

"On December 24, 1997 at approximately 11:19 p.m., a conversation was intercepted on the listening device located in the master bedroom (P-2, conversation number 98). Steven and Marlene Aisenberg were speaking and during the conversation advised 'That amounts to four to five thousand dollar bail.' Marlene replied 'What?' Later in the conversation Steven Aisenberg advised 'It depends on you, you had to deal with the pain everyday. You know what I'm saying, not everybody has that.' Later Marlene Aisenberg advised 'I'm scared." Then Steven Aisenberg advised 'On top of a little baby.' Marlene Aisenberg replied 'I said, I saw them together on the fourth, he was upset I thought, gee, you know could it be dead, you know, dead.' Steven Aisenberg replied 'They belong without you, you, Oh my God, we pulled her clothes off, we, I," Marlene Aisenberg then replied '(inaudible) find it.' They then discussed something about a hospital. Later in the conversation Steven Aisenberg advised 'No, it wouldn't even bother me killing the dog.' 'Umm, the young, talking abuse.' Later in the conversation Marlene Aisenberg advised 'Sell the van, and (inaudible) change that five-hundred (inaudible) baby blanket thrown away.' Steven Aisenberg then advised 'They gonna have to because (inaudible) my baby back (long pause) You know, we can always take the story bac.' (See Exhibit C)"

B.    This conversation was originally monitored by Defendant Debold. The original transcript of the conversation was prepared by Defendant Olmeda.

C.    This recording is largely unintelligible and suffers from the same systemic problems as the recording in paragraph 5 of the First Extension: distortion, muffled voices, interference (ringing) and mechanical hissing

26

*PL*

70.     Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 7 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.     In paragraph 7 of the First Extension Defendants Burton, Blake and Olmeda alleged that:

"On December 28, 1997 at approximately 10:31 a.m. a conversation was intercepted on the listening device located in the master bedroom (P-3, conversation number 132) . Steven Bennett Aisenberg and Marlene Joy Aisenberg were arguing about Marlene talking to people about the case. During the conversation Steven advised '...that's what we're supposed to do. We're supposed pull each other. I'm supposed to look after your back which is what I'm doing and you're not letting me. You're not letting me.' 'Last night was the first time in twelve years I've hated you. I never wanted to hate you. I've done everything in our whole, everything in my life to try to make you happy.' (SEE EXHIBIT 'D')"

B.     This conversation was originally monitored by Defendant Diaz. The original transcript of the conversation was prepared by Defendant Olmeda.

C.     The audibility and context of this conversation is distorted by Defendants Burton, Blake and Olmeda.

71.     Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 8 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.     In paragraph 8 of the First Extension Defendants Burton, Blake and Olmeda alleged that:

"At approximately 10:41 a.m. a conversation was intercepted on the listening device located in the master bedroom (P-4, conversation number 133). Steven and Marlene Aisenberg were speaking and during the conversation Steven stated '. . . and that's it. You just had a stomach ache (inaudible) to worry

27

PL



about it. I don't have to worry so far.' Marlene replied '(inaudible) I hate you, I hate you for what you did to our tiny daughter.' Steven replied, 'Shut up, I know what you did to me.' Marlene then stated 'That is my fault, we didn't need to (inaudible) black people to kidnap her, we need to go back.' Later in the conversation Steven stated 'Our tiny baby didn't suffer because of your,' Marlene interrupted the conversation with an inaudible statement and then advised 'I understand that, I know why you need to (inaudible) you're getting out of control. You won't hear me.' (See Exhibit E)"

B.     This conversation was originally monitored by Defendant Diaz. The original transcript of the conversation was prepared by Defendant Olmeda.

C.     This conversation is unintelligible. It suffers from the same pervasive distortion and noise as the recordings in paragraphs 5 and 6.

D.     The government prepared multiple versions of transcripts of this conversation and each is materially different to the other.

72.     Defendants Burton, Blake and Enriquez intentionally or recklessly misrepresented the audibility, content and context of Paragraph 9 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.     In paragraph 9 of the First Extension Defendants Burton, Blake and Enriquez alleged that:

"On January 6, 1998 at approximately 11:07 p.m. a conversation was intercepted on the listening device located in the master bedroom (P-5, conversation number 269). Steven Bennett Aisenberg and Marlene Joy Aisenberg were having a discussion in reference to the news broadcast about the fact that Marlene had taken a polygraph earlier that day. They discussed Marlene's parents reaction to the news cast. Later in the conversation Marlene advised 'I didn't say shit, I didn't say nothing (inaudible) shit (inaudible) not anything.'(See Exhibit F)"

B.     This conversation was originally monitored by Defendant Dubord. The original transcript of the conversation was prepared by Defendant Enriquez.

*PL*



C.  This conversation is mostly unintelligible.  It is impossible to hear any mention about polygraphs, either from the Plaintiffs or from any news broadcast.

D.  The government also prepared three separate transcripts of this conversation, all of which were materially different.

73.  Defendants Burton, Blake and Diaz intentionally or recklessly misrepresented the audibility, content and context of Paragraph 10 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.  In paragraph 10 of the First Extension Defendants Burton, Blake and Diaz alleged that:

"On December 16, 1997, at approximately 1:05 p.m. a conversation was intercepted on the listening device located in the kitchen. Marlene and Steven Aisenberg had a conversation and during the conversation Steven became upset because Marlene was telling other people about what was going on reference the case. Steven stated 'But there is information they don't need to know, ok.' Later in the conversation Steven reiterated '(inaudible) what happens in this house stays in this house. You can't trust a soul. If the alarm people are calling you can't tell them that stuff, you can't.' (See Exhibit G)"

B.  This conversation was originally monitored by Defendants Enriquez and Diaz. The original transcript of the conversation was prepared by Defendant Diaz.

C.  While this recording is intelligible, the Defendants deliberately or recklessly distorted the conversation by omitting pertinent parts of the recording.

D.  Although Defendants Burton, Blake and Diaz alleged that it proved the Aisenbergs' involvement in the disappearance of Sabrina, the conversation is exculpatory as it demonstrates the Aisenbergs' concern in the integrity of the investigation and their efforts to avoid impeding that investigation.

74.  Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 11 of the First Extension for the purpose of deceiving

29

PL



the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.  In paragraph 11 of the First Extension the Defendants Burton, Blake and Olmeda alleged that:

"At approximately 5:06 p.m., a conversation was intercepted on the listening device located in the kitchen (P-3, conversation number 38). Marlene Aisenberg spoke advising 'Help' 'Me, help me, help me, oh, oh, oh, oh.' (See Exhibit H)

Note: Detective William Blake advised that early in this investigation Marlene Aisenberg was observed speaking the same way as noted in this conversation when under pressure giving indications of possible severe mental or emotional distress."

B.  This conversation was originally monitored by Defendant Enriquez. The original transcript of the conversation was prepared by Defendant Olmeda.

C.  Defendants Burton, Blake and Olmeda misrepresented the conversation with reckless disregard. No reasonable prudent officer would have determined that it was Marlene Aisenberg who screamed out during this conversation.

75.  Defendants Burton, Blake and Enriquez intentionally or recklessly misrepresented the audibility, content and context of Paragraph 12 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.  In paragraph 12 of the First Extension the Defendants Burton, Blake and Enriquez alleged that:

"On December 17, 1997, at approximately 4:41 p.m. a conversation was intercepted on the listening device located in the kitchen (P-4, conversation 104). Marlene Joy Aisenberg, Stanley Sadowsky and Joan Sadowsky engaged in a conversation during the conversation Marlene Aisenberg advised 'That was your friend's mistake, that was their mistake, they changed the way they said it.' Stanley Sadowsky then advised that 'they' were trying to protect Marlene and that he (Stanley Sadowsky) was going to have to

30

PL



change his story completely. Joan Sadowsky then advised 'No you don't change it.' (SEE EXHIBIT 'I')"

    B.    This conversation was originally monitored by Defendant Enriquez. The original transcript of the conversation was prepared by Defendant Enriquez.

    C.    Defendants Burton, Blake and Enriquez intentionally misrepresented the context of this conversation as it has nothing to do with the disappearance of Sabrina.

76.    Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 13 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

    A.    In paragraph 13 of the First Extension Defendants Burton, Blake and Olmeda alleged that:

"At approximately 5:34 p.m. a conversation was intercepted on the listening device located in the kitchen (P-5, conversation number 109). Marlene Joy Aisenberg and Steven Bennett Aisenberg engaged in a conversation and during the conversation Marlene Aisenberg advised 'I don't like lying to my dad at all and I'm in his face (inaudible).' Steven Aisenberg replied '(inaudible) well tell your dad not to ask you any questions concerning the case, cause you can't answer a lot.' Marlene Aisenberg replied 'You know (inaudible) everybody's so quick to think, you know. You don't understand, my parents are here just as much as (inaudible) and I'll tell you one thing, you know if it would have been my father who said about the abusing first.' Steven Aisenberg replied 'I know I have said that already.' They then discussed someone who 'Came up with a crazy idea.' Marlene then complained about her parents being 'shut out completely' and how she (Marlene Aisenberg) doesn't appreciate it. Steven Aisenberg then replied 'But Mar, what you need to understand, there's certain things you cannot say to your parents. When they're questioning your parents, then technically they're not questioning my family, cause they're not here. There are certain things pending, the case, that you cannot say to them. And it's unfortunate that they're so close too, so it's for there sake.' Later in the conversation Steven Aisenberg advised 'No, there's a difference in protecting yourself and not protecting yourself, and if my being rude to your friends means protecting you then I'll be very rude to all your friends, I don't care. My priority is you,

31



not them and your priorities should be yourself and your family, not them. That's why I'm rude to them.' (See Exhibit J)"

B.    This conversation was originally monitored by Defendant Ford. The original transcript of the conversation was prepared by Defendant Olmeda.

C.    Defendants Burton, Blake and Olmeda deliberately or recklessly misrepresented that the word "abusing" is contained on the recording.

77.    Defendants Burton and Blake intentionally or recklessly misrepresented the audibility, content and context of Paragraph 14 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.    In paragraph 14 of the First Extension Defendants Burton and Blake alleged that:

"On December 18, 1997, at approximately 9:03 a.m. a conversation was intercepted on the listening device located in the kitchen (P-6, conversation number 116). Marlene Aisenberg was speaking to Joan Sadowsky on the telephone and during the conversation Marlene discussed the dog Brownie and as to whether the dog barks at strangers. Later in the conversation Marlene discussed the possibility that Marlene's cousin Wendy may have been involved with the missing baby (Sabrina Aisenberg) and continued you know, not to be mean mom, I mean, didn't talk to police since yesterday, but maybe I should tell them about Wendy." (EXHIBIT 'K')

On this date at approximately 2:12 p.m. your affiants met with and discussed the missing child case with Marlene Joy Aisenberg at the Aisenberg residence. Marlene Joy Aisenberg did not mention her cousin Wendy (Whitlow) at any time during the interview as a suspect or in any other context during the conversation.

B.    It is unknown who originally monitored or prepared the original transcript of this conversation.

C.    Defendants Burton and Blake misrepresented the context of this conversation as Wendy Whitlow's name was provided to the investigators two weeks prior to this conversation.

32

PL



78. Defendants Burton, Blake and Dubord intentionally or recklessly misrepresented the audibility, content and context of Paragraph 15 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A. In paragraph 15 of the First Extension Defendants Burton, Blake and Dubord alleged that:

"On December 22, 1997, at approximately 10:24 p.m. a conversation was intercepted on the listening device located in the kitchen (P-7, conversation number 275). Steven Bennett Aisenberg was engaged in a conversation with an unknown party possibly on the telephone. During the conversation Steven advised that they were doing all they could do to find the baby. Then Erwin Aisenberg took the telephone from Steven and during the conversation Erwin advised that they were doing all they could do to get Sabrina back. Erwin also advised that he could care less about what happened to the kidnapper all he cared about was getting Sabrina back. Erwin then began to discuss Steven and Marlene (Aisenberg) going to counseling but he was worried that the results of the counseling would discoverable. Later in the conversation Erwin advised that "Barry" thought the baby was in Brandon or Valrico and that 'Barry' thought the police had conducted a 'Lousy' investigation. (SEE EXHIBIT 'L')"

B. This conversation was originally monitored by Defendant Olmeda. The original transcript of the conversation was prepared by Defendant Dubord.

C. Defendants Burton, Blake and Dubord intentionally or recklessly misrepresented the audibility and context of the conversation in paragraph 15.

79. Defendants Burton, Blake and Enriquez intentionally or recklessly misrepresented the audibility, content and context of Paragraph 16 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A. In paragraph 16 of the First Extension Defendants Burton, Blake and Enriquez alleged that:

33

PL

"On January 1, 1998, at approximately 11:00 am. a conversation was intercepted on the listening device located in the kitchen (P-B, conversation number 587) . Marlene Aisenberg was speaking to an unknown person and discussed what happened on the night of the incident (November 24, 1997). Marlene discussed the fact that the dog 'Brownie' doesn't bark at strangers and then advised 'That's why I, they believe it's somebody who knows us or, or knew Brownie or something like that. But I'll tell you what would be a good test and they're gonna do this (inaudible). They're, gonna come do this (inaudible) Tuesday night at four-thirty in the morning and I feel very confident Brownie's not gonna wake when they, to the door. Now, whether, now she will flip out, that's what I'm interested to know. If she comes out of the bedroom she'll flip out because they're gonna be having infra-red goggles on and she'll flip out, so that's not really gonna be,' (SEE EXHIBIT 'M')"

B.     This conversation was originally monitored by Defendant Enriquez. The original transcript of the conversation was prepared by Defendant Enriquez.

C.     Defendants Burton, Blake and Enriquez deliberately misrepresented the audibility and context of this conversation.

80.     Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 17 of the First Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.     In paragraph 17 of the First Extension Defendants Burton, Blake and Olmeda alleged that:

"On January 5, 1998 at approximately 5:55 p.m. a conversation was intercepted on the listening device in the kitchen (P-11, conversation number 681). Steven Bennett Aisenberg and Marlene Joy Aisenberg were having a general discussion and during the conversation Steven advised 'Let's discuss this independently Hon.' 'Let's discuss that in the bedroom, you gotta pay attention to what's around you.' Later in the conversation Marlene asked 'Did they finish packing, no?' 'What of they check the shed?' Steven replied 'You know nothing.' Marlene then advised 'I said doing it won't kill me, alright, you know, fine.'(See Exhibit N)"

B.     This conversation was originally monitored by Defendant Olmeda. The original transcript of the conversation was prepared by Defendant Olmeda.

34

*PL*

C.      The recording is poor and one can only hear parts of the conversation with any confidence.

D.      Defendants Burton, Blake and Olmeda were simply guessing about the conversation and made these statements with reckless disregard for the truth.

81.    In Paragraphs 20-22 of the First Extension, Defendants Burton and Blake intentionally or recklessly misrepresented that a videotape taken of Sabrina Aisenberg on November 23, 1997 depicted evidence of physical abuse of Sabrina for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.      In paragraphs 20-22 of the First Extension the Defendants Burton and Blake alleged that:

"20.    On November 23, 1997, a video tape recording was made of the missing baby, Sabrina Paige Aisenberg, by the parents. After reviewing this video your affiant's (sic) noted what appeared to be missing hair on the side of the head and bruises on the facial area of the baby. On December 11, 1997, the video tape recording was taken to video enhancement facilities located at Walt Disney World by [Defendant] Detective Carlos Somellan, Hillsborough County Sheriff's Office. Several still photographs were retrieved from the video recording of Sabrina Paige Aisenberg.

21. On December 30, 1997, your affiant, Linda Burton met with Doctor Laleh Posey, a Pediatrician who works with the Child Protection team, Tampa General Hospital. Doctor Posey was given the photographs to examine. Doctor Posey in her expert opinion concluded that hair had been pulled out of the left side of the baby's head and the area around the left eye was bruised. Also noted was a linear bruise was observed on the left side of the face near the mouth. A linear bruise was also noted in the area from where the hair had been pulled out.

22. It should be noted that during the initial interview of Marlene Joy Aisenberg by your affiants she advised that there were no injuries to Sabrina Paige Aisenberg prior to her reported disappearance."

35

PL



B. Defendants Burton and Blake failed to inform Judge Alvarez that the pictures extracted from the November 22,1 997 videotape of Sabrina Aisenberg were specifically selected by Defendant Somellan and that those pictures misrepresented Sabrina's true physical condition.

C. Defendants Burton and Blake omitted the substance of interviews of individuals who saw Sabrina the 2-3 days before her disappearance who stated that Sabrina Aisenberg did not have any hair missing or bruises on her face.

D. Defendants Burton and Blake also omitted the fact that Sabrina had attended a birthday party the day after the video was taken and that a video and pictures of Sabrina taken at that party clearly show that Sabrina has no bruises on her face.

82. In Paragraphs 23-24 of the First Extension, the Defendants Burton and Blake intentionally or recklessly misrepresented the testimony of witnesses who saw Sabrina just a few days before her disappearance for the purpose of deceiving the and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A. In paragraphs 23-24 of the First Extension the Defendants Burton and Blake alleged that:

"23. During the initial interview Marlene Aisenberg advised that on November 22, 1997 she had taken both Sabrina Joy Aisenberg and William Aisenberg, her older son, to Mr. Willys Hair Salon, located at 3634 Lithia-Pinecrest Road, Valrico, Florida. Williams (sic) hair was cut by Stacey Allen, an employee of Mr. Willys Hair Salon.

24. On December 17, 1997, your affiant Linda Burton interviewed Stacey Allen and Allen advised that she had observed hair missing from the left side of Sabrina Paige Aisenberg's head."

B. Defendants Burton and Blake acted deliberately or with reckless disregard by alleging that Stacey Allen was interviewed on December 17, 1997 because Stacey Allen was on maternity leave on that date.

36

PL

C.     Even assuming Defendants Burton and Blake interviewed Stacey Allen as they assert in the First Extension, the Defendants Burton and Blake acted deliberately or with reckless disregard because they intentionally or recklessly misrepresented the substance of Stacey Allen's interview. Stacey Allen informed Defendant Burton that Sabrina's hair appeared to be rubbed off in a manner typical of newborns and not that it had been pulled out as Defendants imply in the First Extension.

83.    In Section VI of the First Extension, the Defendants asserted that there were no reasonable investigative procedures which could be pursued to assist in solving the crime so that there was no option to resort to surreptitious interception of the Aisenbergs' private communications. This statement was a knowing and intentional falsehood as the Defendants failed to give the reviewing judge a full and complete statement of their investigative efforts which, if they had, would have likely resulted in the Original Application being denied.

## MISREPRESENTATIONS IN SECOND EXTENSION

84.    Throughout the Second Extension, the Defendants Burton and Blake, with others, intentionally or recklessly misrepresented numerous material facts and omitted facts which would have materially affected statements made in the Second Extension.

85.    Upon information and belief, Defendants Kunz and Bedke had knowledge of these intentional misrepresentations and promoted these falsehoods in their effort to falsely inculpate the Plaintiffs and manufacture a criminal case against them.

86.    Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 7 of the Second Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

37

PL

A.    In paragraph 7 of the Second Extension Defendants Burton, Blake and Olmeda alleged that:

"On January 11, 1998, at approximately 9:52 p.m. a conversation was intercepted on the listening device located in the master bedroom (P-6, conversation number 315). Marlene Joy Aisenberg and her son, William Aisenberg were talking and Marlene asked if William Had made some story up and if he did she needed to know about it. William replied 'I didn't, I didn't.' and Marlene asked again 'Did you make the whole thing up?' (SEE EXHIBIT K)"

B.    This conversation was originally monitored by Defendant Olmeda. The original transcript of the conversation was prepared by Defendant Olmeda.

C    Defendants Burton, Blake and Olmeda misrepresented the audibility and context of this conversation.

87.    Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 8 of the Second Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.    In paragraph 8 of the Second Extension Defendants Burton, Blake and Olmeda alleged that:

"On January 11, 1998, at approximately 11:03 p.m. a conversation was intercepted on the listening device located in the master bedroom (P-8, conversation number 318). Marlene Joy Aisenberg and Steven Bennett Aisenberg where having a conversation and after much general conversation Marlene stated 'No, now that everything is out, now that we're out, you know, now there's nothing, can't tell us nothing you know, Like about the pushing us, you know.' (SEE EXHIBIT L)"

B.    This conversation was originally monitored by Defendant Dubord. The original transcript of the conversation was prepared by Defendant Olmeda.

C.    Defendants Burton, Blake and Olmeda misrepresented the audibility and context of this conversation.

38

88.    Defendants Burton, Blake and Orgeron intentionally or recklessly misrepresented the audibility, content and context of Paragraph 10 of the Second Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.    In paragraph 10 of the Second Extension Defendants Burton, Blake and Orgeron alleged that:

"On January 29, 1998, at approximately 11:40 p.m. a conversation was intercepted on the listening device located in the bedroom (P-9, conversation number 451). Steven Bennett Aisenberg and Marlene Joy Aisenberg had returned from appearing on the Oprah Winfrey show and were discussing matters concerning the show and investigation. Marlene Aisenberg makes a comment which is partially inaudible and on two separate occasions, Steven Aisenberg responds to Marlene Aisenberg's statement by responding 'They have that!!!' To which Marlene Aisenberg answers 'Well . . . they haven't figured it out yet.' Marlene Aisenberg then discusses with Steven Aisenberg a Tampa Tribune article which comments on how Oprah Winfrey was skeptical about the story surrounding the disappearance of baby Sabrina. (See Exhibit M)"

B.    This conversation was originally monitored by Defendant Dubord. The original transcript of the conversation was prepared by Defendant Orgeron.

C.    Defendants Burton, Blake and Orgeron recklessly misrepresented the context of this conversation that it evinces the Aisenbergs' determination to hide something from the police.

89.    Defendants Burton, Blake and Diaz intentionally or recklessly misrepresented the audibility, content and context of Paragraph 11 of the Second Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.    In paragraph 11 of the Second Extension Defendants Burton, Blake and Diaz alleged that:

39

PL

"On January 31, 1998, at 2:11 p.m. a conversation was intercepted on the listening device located in the bedroom (P-11 conversation number 473) . Marlene Aisenberg, Stan Sadowski, and Joan Sadowski are discussing the upcoming Federal grand jury appointment and Marlene Aisenberg is discussing Steven Aisenberg's testimony. Marlene Aisenberg states '...give him immunity so anything that Steve says can't be used against him, but that doesn't mean he can't perjure himself. If he says anything that's different from what they have...they would perjure himself.' (SEE EXHIBIT N)"

B.    This conversation was originally monitored by Defendant Chronister. The original transcript of the conversation was prepared by Defendant Diaz.

C.    Defendants Burton, Blake and Diaz misrepresented the audibility and context of this conversation.

90.    Defendants Burton, Blake and Orgeron intentionally or recklessly misrepresented the audibility and context of Paragraph 12 of the Second Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.    In paragraph 12 of the Second Extension Defendants Burton, Blake and Orgeron alleged that:

"On January 31, 1998, at approximately 2:24 p.m. conversation was intercepted on the listening device located in the bedroom (P-10, conversation number 476). Marlene Aisenberg, Stan Sadowski, and Joan Sadowski are conversing and Marlene Aisenberg comments 'They really believe that I took that baby . . .' which Joan Sadowski responds 'God forbid.' Stan Sadowski then asks Marlene Aisenberg 'and what did you do?' to which Marlene Aisenberg begins to respond by stating 'Nothing cause I . . .' at which point Stan Sadowski then interrupts her sentence. Stan Sadowski again asks 'No, what you do with (both Marlene Aisenberg and Stan Sadowski talk at same time) . . .What?' Joan Sadowski then begins to talk about law enforcement searching the nearby lakes and states '...they did the pond now for the second time, I mean, come on.' at which point Stan Sadowski again asks Marlene Aisenberg 'If you did something to her, what did do to her?' Marlene Aisenberg continues to deny doing anything with baby Sabrina. (SEE EXHIBIT 0)"

40



B. This conversation was originally monitored by Defendant Chronister. The original transcript of the conversation was prepared by Defendant Orgeron.

C. Defendants Burton, Blake and Orgeron misrepresented the audibility and context of this conversation.

91. Defendants Burton, Blake and Chronister intentionally or recklessly misrepresented the audibility, content and context of Paragraph 13 of the Second Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A. In paragraph 13 of the Second Extension Defendants Burton, Blake and Chronister alleged that:

"On January 31, 1998, at approximately 2:32 p.m. a conversation was intercepted on the listening device located in the bedroom (P-12 conversation number 478) Marlene Aisenberg and Steven Aisenberg are discussing the upcoming Federal grand jury testimony and Marlene Aisenberg states 'Right now they don't have any evidence strong enough to indict me.' to which Steven Aisenberg asks 'Because?' Marlene Aisenberg answers Steven Aisenberg by commenting 'Because I just can't imagine, they can't try to indict me without a baby. It can't happen without the baby. But probably would have to have some strong evidence.' to which Steven Aisenberg responds 'Strong evidence.' (SEE EXHIBIT P)"

B. This conversation was originally monitored by Defendant Chronister. The original transcript of the conversation was prepared by Defendant Chronister.

C. Defendants Burton, Blake and Chronister misrepresented the audibility and context of this conversation.

92. Defendants Burton, Blake and Orgeron intentionally or recklessly misrepresented the audibility, content and context of Paragraph 14 of the Second Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

PL



A.    In paragraph 14 of the Second Extension Defendants Burton, Blake and Orgeron alleged that:

> "On January 17, 1998, at approximately 9:21 a.m. conversation was intercepted on the listening device located in the kitchen (P-14, conversation number 854). Steven Bennett Aisenberg was speaking with an unknown subject. Aisenberg discussed the possibility of an on going investigation in Maryland involving him (Aisenberg) losing a job there. Later in the conversation Aisenberg stated 'Yeah, you know, something did happen in the car. She gave me oral sex and that was it. So, you know, it's not something I'm proud of, it's something that happen and I have to work hard, to put it behind me. But ummm, they're trying hard to bring it out.' (SEE EXHIBIT Q)"

B.    This conversation was originally monitored by Defendant Chronister. The original transcript of the conversation was prepared by Defendant Orgeron.

C.    Defendants Burton, Blake and Orgeron misrepresented the audibility and context of this conversation.

93.    Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 15 of the Second Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.    In paragraph 15 of the Second Extension Defendants Burton, Blake and Olmeda alleged that:

> "On January 21, 1998, at approximately 7:46 p.m. a conversation was intercepted on the listening device located in the kitchen (P-15, conversation number 947). Steven Bennett Aisenberg was speaking with an unknown subject on the telephone in the kitchen of the residence and is discussing the results of the polygraph he and Marlene Aisenberg had taken. Steve Aisenberg is telling unknown person that he (Steve Aisenberg) is confused how...my polygraph was ousted 100% So that means I didn't about anything.' and 'Marlene' s was inconclusive. . .' when asked '. . . if she knew anything about what happened . . .' Steve Aisenberg goes on to state '. . .how could it come out that way. . .' (SEE EXHIBIT R)"

42

PL



B.    This conversation was originally monitored by Defendant Ford. The original transcript of the conversation was prepared by Defendant Olmeda.

C.    Defendants Burton, Blake and Olmeda misrepresented the audibility and context of this conversation.

94.    Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 16 of the Second Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.    In paragraph 16 of the Second Extension Defendants Burton, Blake and Olmeda alleged that:

"On January 21, 1998, at approximately 7:50 p.m. a conversation was intercepted on the listening device located in the kitchen (P-16, conversation number 948). Steven Bennett Aisenberg was speaking with an unknown subject on the telephone in the kitchen of the residence and tells the unknown subject to '. . . do what they feel comfortable doing.' because that person knows about just as much as the Aisenbergs do. The conversation then changes to the polygraph results which both Steve and Marlene Aisenberg had taken. Steve Aisenberg states 'Marlene failed the second polygraph, not that it was inconclusive which is what they told us that night.' (SEE EXHIBIT S)"

B.    This conversation was originally monitored by Defendant Ford. The original transcript of the conversation was prepared by Defendant Olmeda.

C.    Defendants Burton, Blake and Olmeda misrepresented the audibility and context of this conversation.

95.    Defendants Burton, Blake, Diaz and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 17 of the Second Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

43

PL



A.    In paragraph 17 of the Second Extension Defendants Burton, Blake, Diaz and Olmeda alleged that:

"On January 21, 1998, at approximately 9:19 p.m., a conversation was intercepted on the listening device located in the kitchen (P-17, conversation number 955). Steven Aisenberg is talking to an unknown subject on the telephone and during the conversation, he and Marlene Aisenberg both begin talking at the same time about the bruises and the hair in the photographs of Sabrina Aisenberg. Steven Aisenberg comments '. . . you don't see . . . under the eye . . .' 'There's bruises.' Marlene Aisenberg talks over Steven Aisenberg states, again 'the hair.' to which Steven Aisenberg states, again concerning the pictures of Sabrina Aisenberg, '. . . over there, one with the hair. . .' Marlene and Steven Aisenberg then begin a conversation concerning an incident involving a bathtub and sedatives. Some of the conversation involved talking over each other. Steven Aisenberg states '. . . the sedatives . . . you know, we did it and then you, they climbed in.' to which Marlene Aisenberg responds 'and she . . . drink.'' to which Steven Aisenberg answers 'then I quieted you.' 'Then I quieted you and then you like got up because the kids were crying in the bath tub, take care of that and ummm that's when we use it. . . .' Later in the conversation, Marlene Aisenberg reminds Steven Aisenberg that 'You know we can't say anything . . . brother, without talking to Barry. . .' Marlene and Steven Aisenberg then continue the conversation discussing the video of Sabrina Aisenberg. (See Exhibit T)"

B.    This conversation was originally monitored by Defendant Ford. The original transcript of the conversation was prepared by Defendants Olmeda and Diaz.

C.    Defendants Burton, Blake, Diaz and Olmeda deliberately or recklessly distorted the context of the conversation by failing to disclose that an hour before the conversation the Defendants had confronted the Aisenbergs with photographs of Sabrina and Marlene Aisenberg denied seeing any bruises.

D.    Defendants Burton, Blake, Diaz and Olmeda also omitted that they had stopped by Ginny Westberg's house, showed her the same photographs and had been told that she did not see any evidence of bruising.

E.    Defendants Burton, Blake, Diaz and Olmeda also included statements which the Aisenbergs did not say or cannot be heard.

96.    Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 18 of the Second Extension for the purpose of deceiving

44

PL

the court and inducing it to authorize a continuation of the interception of oral communications from

within the home of Steven and Marlene Aisenberg.

A.  In paragraph 18 of the Second Extension Defendants Burton, Blake and Olmeda alleged that:

"On January 21, 1998, at approximately 9:54 p.m. a conversation was intercepted on the listening device located in the kitchen (P-18, conversation number 958). Marlene Joy Aisenberg is discussing the hair missing from Sabrina Aisenberg. She states '. . . I mean . . . you know . . . hair, that light spot where hair is . . . and um, they said that it . . . pulled out.'(See Exhibit U)"

B.  This conversation was originally monitored by Defendant Olmeda.  The original transcript of the conversation was prepared by Defendant Olmeda.

C.  Defendants Burton, Blake and Olmeda deliberately or recklessly distorted the statement by omitting the fact that Marlene Aisenberg is telling someone about the Defendants' visit to her home.

D.  Defendants Burton, Blake and Olmeda also deliberately or recklessly omit from their summary of the conversation Marlene Aisenberg's statement "unbelievable" in response to the claim that Sabrina's hair had been pulled out.

97.  Defendants Burton, Blake and Diaz intentionally or recklessly misrepresented the

audibility, content and context of Paragraph 19 of the Second Extension for the purpose of deceiving

the court and inducing it to authorize a continuation of the interception of oral communications from

within the home of Steven and Marlene Aisenberg.

A.  In paragraph 19 of the Second Extension Defendants Burton, Blake and Diaz alleged that:

"On January 25, 1998, at approximately 9:52 p.m. a conversation was intercepted on the listening device located in the kitchen. (P-20, conversation number 1032). Marlene Joy Aisenberg and Steven Bennett Aisenberg were having a conversation and it becomes apparent that Marlene Aisenberg has said something to someone which concerns Steven Aisenberg. Marlene Aisenberg is nonchalant about making the statement and advises '. . . I am

45

PL

 

glad I told her.' to which Steven Aisenberg responds 'Hon, you know, you just don't, be careful.' Steven Aisenberg goes on to state that this '. . . is also backfiring on us."'. . . you got very lucky, you know what I'm saying ok, how many other people did you tell?' Marlene Aisenberg then discusses the polygraph with Steven Aisenberg and states to him ". . . . they told me something different and you said to fake it. . . .' After more brief conversation, Steven Aisenberg then instructs Marlene Aisenberg to 'Just don't talk to anyone.''Just do what I ask.' (See Exhibit V)."

B.   This conversation was originally monitored by Defendant Diaz. The original transcript of the conversation was prepared by Defendant Diaz.

C.   Defendants Burton, Blake and Diaz deliberately or recklessly misrepresent the context of the conversation as none of the statements made by the Aisenbergs are incriminating.

D.   Defendants  Burton, Blake and Diaz also deliberately or recklessly misrepresent the statement "you said to fake it" when in fact, the statement is "you spoke to David."

98.   Defendants Burton, Blake and Olmeda intentionally or recklessly misrepresented the audibility, content and context of Paragraph 21 of the Second Extension for the purpose of deceiving the court and inducing it to authorize a continuation of the interception of oral communications from within the home of Steven and Marlene Aisenberg.

A.   In paragraph 21 of the Second Extension Defendants Burton, Blake and Olmeda alleged that:

"On January 28, 1998, at approximately 9:31 p.m., a conversation was intercepted on the listen device located in the kitchen (P-22, conversation number 1065). Steven Bennett Aisenberg is talking to an unknown individual over the telephone and is discussing with the individual how people are trying to be helpful and inquiring about his health and ultimate outcome of the missing baby Sabrina. Steven Aisenberg states 'You know, they're people trying to help, you know? They always call about your health too, you know . . . hopefully you're not another Susan Smith, you know, and that's very difficult.' The reference to Susan Smith being the mother in South Carolina who reported her two sons kidnapped while stopped at a traffic signal and later confessed to murdering them. (SEE EXHIBIT W)"

46

PL



B.  This conversation was originally monitored by Defendant Olmeda. The original transcript of the conversation was prepared by Defendant Olmeda.

C.  Defendants Burton, Blake and Olmeda misrepresented the audibility and context of this conversation.

99.  In Section VI of the Second Extension, the Defendants asserted that there were no reasonable investigative procedures which could be pursued to assist in solving the crime so that there was no option to resort to surreptitious interception of the Aisenbergs' private communications. This statement was a knowing and intentional falsehood as the Defendants failed to give the reviewing judge a full and complete statement of their investigative efforts which, if they had, would have likely resulted in the Original Application being denied.

## INVOLVEMENT OF UNITED STATES ATTORNEY'S OFFICE
## AND ABUSE OF THE FEDERAL GRAND JURY

100.  Defendants Bedke and Kunz were involved in the investigation of Sabrina's disappearance early in the investigation.

A.  Federal grand jury subpoenas were issued as early as December 1, 1997.

B.  Defendants Kunz and Bedke assisted the HCSO in the investigation.

C.  Upon information and belief, Defendants Kunz and Bedke offered legal advice on the propriety and drafting of the Application for Interception of Certain Oral Communications.

D.  Defendants Kunz and Bedke attended Sabrina Task Force meetings and remained aware of and influenced the progress of the oral intercept through personal contact with the remaining Defendants and others.

E.  Defendants Kunz and Bedke assisted investigators in developing potential leads in an effort to implicate the Aisenbergs in their daughters disappearance.

F.  From approximately December 1, 1997 to at least March 1998, Defendants Kunz and Bedke acted as investigators and used the federal grand jury as an

47

PL



investigative tool. Throughout this time period, the government did not have sufficient probable cause to arrest the Aisenbergs for the disappearance of their daughter, Sabrina Aisenberg.

G.      While the grand jury was in session, and before they had probable cause to arrest Steven and Marlene Aisenberg, Defendants Kunz and Bedke conspired with and induced Defendant Burton to make materially false and misleading statements to the grand jury for the purpose of distorting the truth, deceiving the grand jury and recklessly and corruptly influencing the investigation to frame the Aisenbergs and deny them due process of law.

H.      On February 4, 1998, Defendant Kunz asked Defendant Burton to detail to the grand jury the conversations contained in the First Extension knowing he was soliciting perjurous testimony for the purpose of distorting the truth, deceiving the grand jury and recklessly and corruptly influencing the investigation to frame the Aisenbergs and deny them due process of law.

I.      On February 4, 1998, Defendant Kunz asked Defendant Burton about a video taken of Sabrina Aisenberg on November 23, 1997 and permitted Defendant Burton to testify that medical doctors with the Child Protection Team "indicated that there appeared to a bruise under her left eye, that she had a bruise on her face, there was a marked area up under her lip. Dr. Gilbert Barness did see the bruise on the arm. Dr. Posey said she believed that there was a linear cut on the head where the hair had been pulled out, and Dr. Brooks agreed with all those," when Defendant Kunz knew that these doctors had not stated that the video evidenced abuse to Sabrina. This was done for the purpose of distorting the truth, deceiving the grand jury and recklessly and corruptly influencing the investigation to frame the Aisenbergs and deny them due process of law.

J.      On February 4, 1998, Defendant Kunz elicited from Defendant Burton testimony that a hairdresser stated but Sabrina's hair "looked like it had been rubbed off and hair had been pulled down over it to cover it." However, neither Defendant Kunz, Defendant Burton, nor Defendant Bedke, who was also present, told the grand jury that the hairdresser likened the allegedly missing hair to that of all infants whose hair is rubbed off during the course of the day. This was done for the purpose of distorting the truth, deceiving the grand jury and recklessly and corruptly influencing the investigation to frame the Aisenbergs and deny them due process of law.

K.      On February 4, 1998, Defendant Kunz induced Defendant Burton to misrepresent the testimony of witnesses who had seen Sabrina on Sunday November 24, 1997 at a birthday party for the purpose of distorting the truth,

48

PL



deceiving the grand jury and recklessly and corruptly influencing the investigation to frame the Aisenbergs and deny them due process of law. For example:

1.    In response to questions about the people who saw Sabrina on the morning before her disappearance, Defendant Burton told the grand jury that "Most of the people indicated that they really didn't spend much time looking at Sabrina. They were there for a party for the children. And they did notice that she had she was dirty, she didn't have clean clothes on, that she slept most of the time. It depended on who you talked to. We had some people that said, yeah, the baby was awake. Other people said, no, she slept most of the time. They tried to give her a bottle, she wouldn't take it at noon. But as far as really spending time looking at the child, they really didn't." Several of these same witnesses later testified during a hearing in the pre-trial stage that they saw Sabrina and that they did not see any signs of abuse, either bruising about the face or hair having been pulled out of her head.

2.    In response to questions about a neighborhood girl who was seen in the videotape which allegedly evidences abuse of Sabrina, Defendant Burton stated: "We asked her. You know, she's a child, so, you know, she said, yeah, I saw her, you know, played with her on the floor. But as far as really being cognizant of that kind of thing, at eight you really don't expect them to. So she really didn't have anything to say about that." The neighborhood girl's father later testified at a hearing in the pre-trial stage and testified that his daughter stated that she did not see any signs of abuse to Sabrina.

L.    On February 4, 1998, Defendant Bedke permitted Defendant Burton to lie and state that Marlene Aisenberg did not purchase baby food at Publix on November 24, 1997 when Defendant Bedke was in possession of a receipt from Publix which indicated that Marlene Aisenberg had in fact purchased baby food that day. This was done with the purpose of distorting the truth, deceiving the grand jury and recklessly and corruptly influencing the investigation to frame the Aisenbergs and deny them due process of law.

M.    On October 21, 1998, Defendant Kunz had Defendant Burton read the transcripts attached as exhibits to the Extension Applications for Interception of Oral Communications to the federal grand jury even though Defendant Kunz knew that the transcripts were not reflective of the truth and that many

49

PL



of the tapes were largely inaudible. Defendants Kunz and Burton did this for the purpose of distorting the truth, deceiving the grand jury and recklessly and corruptly influencing the investigation to frame the Aisenbergs and deny them due process of law.

N.    Defendant Kunz permitted Defendant Burton to provide contradictory descriptions of intercepted communications for the purpose of distorting the truth, deceiving the grand jury and recklessly and corruptly influencing the investigation to frame the Aisenbergs and deny them due process of law. As previously alleged, one of the intercepted conversations included as Exhibit V in the Second Extension, paragraph 19, concerned a conversation between Steven and Marlene Aisenberg wherein Steven Aisenberg allegedly says that something is "also back-firing on us." Defendant Burton was permitted to give three different conclusions:

1.    On November 11, 1998, Defendant Burton stated that Steven Aisenberg's reference to a "clip backfiring on us" referred to the video taken by Marlene Aisenberg of Sabrina on November 23, 1997.

2.    On September 8, 1999, Defendant Kunz asked Defendant Burton "did Steve and Marlene discuss that the People Magazine article on them and the disappearance of Baby Sabrina from their perspective was back-firing on them. . . ." To which Defendant Burton answered "yes."

3.    On December 19, 2000, at a hearing in the pre-trial stages of the criminal prosecution, Defendant Burton testified that what was back-firing was the video plea for Sabrina's return made by Steven and Marlene Aisenberg on November 24, 1997.

101.    On or about January 30, 1998, at approximately 8:45 p.m., the Aisenbergs were subpoenaed to appear before the federal grand jury on Wednesday, February 4, 1998.

102.    Both in correspondence and court pleadings and under the circumstances, the Aisenbergs' stated their intention to invoke their Fifth Amendment Privilege against self-incrimination if they were compelled to appear before the grand jury.

A.    On or about February 2, 1998, the Aisenbergs' lawyers met with Defendants Kunz and Bedke in person, informed him the Aisenbergs would invoke their

PL



Fifth Amendment Privilege against self-incrimination and requested a release from the subpoena. The Aisenbergs also offered to subject themselves to interviews as long as the interviews were recorded.

B.    On or about February 2, 1998, the Aisenbergs' lawyers met with Defendant Terry in person, informed him the Aisenbergs would invoke their Fifth Amendment Privilege against self-incrimination and requested a release from the subpoena. The Aisenbergs also offered to subject themselves to interviews as long as the interviews were recorded.

C.    On or about February 4, 1998, the Aisenbergs filed an Emergency Motion to Continue Appearance Date and for Leave to File Motions Seeking Other Forms of Relief. A one week continuance of their grand jury appearance was granted.

D.    On or about February 10, 1998, the Aisenbergs' attorney wrote a letter to United States Attorney Charles Wilson, informing him the Aisenbergs intended to invoke the Fifth Amendment and asking him to review the matter. Mr. Wilson replied by stating that Defendant Kunz would not release the Aisenbergs from the grand jury subpoenas.

103.    Upon information and belief, Defendants Kunz, Bedke and Terry were responsible for leaking the exact date and time of the Aisenbergs' appearance before the grand jury knowing the Aisenbergs, by invoking their privilege against self-incrimination, would testify for a short period of time.

104.    The purpose of the Defendants requiring the Aisenbergs' to appear before the grand jury, notwithstanding their announced intention to invoke their Fifth Amendment Rights, was to improperly influence the investigation by promoting media speculation that the Aisenbergs invoked their privilege against self-incrimination.

105.    Defendants Kunz and Bedke were aware, through experience and by notice from the Aisenbergs' counsel, that the public believes that any person who invokes their privilege against self-incrimination is guilty of the alleged misconduct.



106. During the course of their appearance before the grand jury, Marlene and Steven Aisenberg were asked questions which Defendants Kunz and Bedke knew were false and misleading but were nonetheless asked for the sole purpose of corruptly prejudicing the grand jurors during their investigation of this matter. For example,

A. Among other things, Defendant Kunz asked Steven Aisenberg:

1. Mr. Aisenberg, did you have -- on or about November 24, 1997, did either you, your wife or any of the children were you all taking any medication or any over-the-counter drugs or any prescribed medicine whatsoever?"

2. "Prior to the disappearance of Sabrina, Baby Sabrina, had you observed any injuries to her on her face?"

3. "Had you observed any problem with her hair, namely that it appeared as if some hair had been pulled out according to video that was taken by your wife on or about November 22, 1997?"

4. "Are you going to provide any information to assist this Grand Jury in trying to identify those individuals who were responsible for the disappearance of Baby Sabrina?"

B. Among other things, Defendant Kunz asked Marlene Aisenberg:

1. "And prior to November 24, 1997, were any members of the family, you, Steven, Monica or William Aisenberg, were you taking any medication, whether it be cold medication or prescription medication or over-the-counter medication of any type?"

2. "Did Baby Sabrina have any metabolic problem or any problem with respect to her body that had her sleeping an extensive amount?"

3. "Did Baby Sabrina have any bruises on her body prior to her disappearance on November 24, 1997, ma'am?"

4. "Did Baby Sabrina have any problems with her hair, any bald spots or any spots on her head where hair had been removed or pulled out?"

52

5.    "Ms. Aisenberg, can you explain to the Grand Jury why photographs made from the video that you had taken of Baby Sabrina indicate that there are some apparent injuries to Baby Sabrina on her face and also her head having some hair missing?"

6.    "Ma'am, can you tell the Grand Jury if, in fact, you've been interviewed by investigators either with the sheriff's office or the Federal Bureau of Investigation?"

7.    "Can you tell the Grand Jury if your husband, Steven Aisenberg -- if you had ever observed him mistreating any of the children, namely Monica, William or even Sabrina?"

8.    "Can you tell the Grand Jury if you're aware of your husband Steven Aisenberg whether he has a history of violent behavior or not?"

9.    "Ms. Aisenberg, are you aware of any violent behavior conducted by your husband after he had resigned from a job in Virginia following an allegation of a sexual assault that he was involved in?"

10.    "Will you provide any information to this Grand Jury, ma'am, concerning the disappearance of your child?"

107.    The questions asked of Steven and Marlene Aisenberg were asked for the purpose of prejudicing the grand jury as Defendants Kunz and Bedke knew the question would deceive the grand jury to believe the facts in question where true.  Defendant Kunz had no good faith basis to ask the questions he asked.

## IMPROPER USE OF DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

108.    On or about January 26, 1998, Defendant Bullara contacted Florida Department of Health and Rehabilitative Services (n/k/a Department of Children and Families)(hereinafter "HRS") and alleged that the videotape of Sabrina Aisenberg taken on November 23, 1997 indicated potential physical abuse of Sabrina Aisenberg. Defendant Bullara knew this to be false and contacted HRS with the intention of using and exploiting the authority of HRS for the purpose of taking the



Aisenbergs' other children, William and Monica, and to intimidate and harass the Aisenbergs for the purpose of recklessly and corruptly influencing the investigation to frame the Aisenbergs and deny them due process of law.

109.    Defendant Bullara then asked HRS not to contact the parents as they did not want Steven and Marlene Aisenberg alerted to the evidence of still photographs extracted from the November 23, 1997 videotape of Sabrina, even though Defendant Burton had shown the Aisenbergs the pictures on January 21, 1998.

110.    On or about February 9, 1998, shortly before the Aisenbergs were scheduled to appear before the grand jury, Defendant Bullara contacted HRS again and stated HRS could now contact the Aisenbergs and question them.  Defendant Bullara's purpose in contacting HRS on this date was to intimidate the Aisenbergs and wrongfully influence them in anticipation of their appearance before the federal grand jury the next day.

111.    On or about February 10, 1998, the night before the Aisenbergs' scheduled grand jury appearance,  HRS investigators visited the Aisenbergs residence outside the presence of the Aisenbergs' attorneys at the direction of HCSO for the purpose of intimidating the Aisenbergs, abrogating the Aisenbergs' right to be represented during investigative interrogations and stimulating conversation to be captured on the oral intercept.

112.    Upon being contacted by HRS investigators, the Aisenbergs cooperated with these investigators, spoke freely with them, and allowed them to question their children, William and Monica, without conditions, stipulations or interference.

54

113.   The HRS investigators who had an opportunity to view the children and speak to them in private did not observe any signs of abuse or neglect to William or Monica and did not determine that William or Monica were subjects of abuse or should be taken from the family home.

114.   Throughout the HRS investigation, Defendants Burton and Bullara were involved in case review meetings and kept abreast of all developments.

A.   On March 4, 1998, both Defendants Burton and Bullara were present at an HRS staff meeting where the Aisenberg investigation was discussed.

B.   On May 7, 1998, Defendants Bullara and Burton were present at another HRS staff meeting. At this meeting Defendants Bullara and Burton informed HRS that Monica suffered from vaginitis, which they asserted was an indication of alleged sexual abuse, and that Steven Aisenberg was involved in a sexual battery in Maryland. This allegation was consistent with Defendant Burton's purpose to wrongly investigate and fabricate evidence.

C.   After two doctors thoroughly reviewed Monica's medical records and reported that there was no evidence of sexual abuse, Defendant Burton attempted to locate another doctor to review Monica's medical records. This allegation was consistent with Defendant Burton's purpose to wrongly investigate and fabricate evidence.

D.   On or about October 15, 1998, Defendants Bullara and Burton were present at another HRS meeting. At this meeting Defendants Bullara and Burton stated that there was more information available but that it could not be disclosed because of the ongoing grand jury investigation although they had selectively leaked other grand jury matters to HRS investigators previously.

115.   Upon information and belief, Defendants Kunz and Bedke were involved in the decision to contact HRS to use HRS to intimidate the Aisenbergs and influence their conduct and had discussion with HCSO and HRS requesting reports on the status of the investigation.

116.   Once HRS investigators had concluded their investigation through their exercise of independent judgment, evaluation of all allegations of physical and sexual abuse, and rejection of the efforts of Defendants Burton, Blake, Terry, Bullara, Kunz and Bedke, they determined that there

55

PL



was no merit to the Defendants' allegations and that there was no reason to believe the Aisenberg children should be removed from their home.

117.   On or about October 15, 1998, the case was closed without action by HRS.

## WRONGFUL AND FALSE DISCLOSURES TO PRESS

118.   Throughout the course of the investigation, Defendants Burton, Blake, Henderson, Terry, Kunz, Bedke, and Brown systematically and routinely disclosed to the press erroneous and prejudicial information about the investigation in order to improperly influence public opinion and prejudice the potential grand and petit jurors. Indeed, Defendant Kunz previously provided the news media with information in an effort to improperly influence the jury pool in the case of US v. Netter, 91-175-Cr-J-]6(M.D. Fla. February 10, 1992).

119.   On or about December 11, 1997, Defendants Burton, Blake, Henderson, Terry, Kunz, Bedke, and Brown notified the press that a white van may have been related to Sabrina's disappearance, even though investigators had already interviewed the owners of the van and determined that this evidence was irrelevant. As the Defendants knew, the Aisenbergs had a white van and that by disclosing this information, it would cast suspicion upon the Aisenbergs in the eyes of the public.

120.   On or about January 8, 1998, Defendant Brown informed the press that the Aisenbergs had been given a total of three polygraphs by investigators.

121.   On or about January 22, 1998, at a news conference, Defendant Terry informed the press that there had been "significant information" gathered by sheriff's investigators who went to Maryland and Virginia to gather background information concerning the Aisenbergs. At this same

56



news conference, Defendants Terry and Brown stated they had "serious suspicions" about the Aisenbergs.

122.    On or about January 30, 1998, a local news channel aired a story about the task force's investigation in Maryland of an alleged sexual harassment claim against Steven Aisenberg which had occurred almost 10 years previously. This investigation was done with the purpose of wrongly portraying Steven Aisenberg as a sexual offender and attempting to intimidate and divide the Aisenbergs.

> A.    Upon information and belief, Defendants Burton, Blake, Henderson, Terry, Kunz, Bedke, and Brown notified the media that they were traveling to Maryland to investigate this claim.

> B.    Upon information and belief, the Defendants Burton, Blake, Henderson, Terry, Kunz, Bedke, and Brown notified the media of the identity of the alleged victim of the harassment.

> C.    At least one member of the media traveled with law enforcement and reported on the investigation from Maryland with investigators in the background.

123.    Upon information and belief, on the eve of the Aisenbergs' scheduled grand jury appearance, Defendants Burton, Blake, Henderson, Terry, Kunz, Bedke, and Brown, or persons acting on their behalf, leaked to the press that the Aisenbergs were to appear before the federal grand jury. This conduct was designed to prejudice the potential jury pool by requiring the Aisenbergs to appear before the grand jury to invoke their right against self-incrimination and have the press report: 1) the Aisenbergs had been subpoenaed to appear before the grand jury as targets of the grand jury investigation; and 2) the Aisenbergs were only in the grand jury room for a short period of time which would make it appear that they invoked their right against self-incrimination.

PL

124.    On February 5, 1998, Defendant Greg Brown, on behalf of the HCSO, stated to the St. Petersburg Times: "We felt the grand jury was the appropriate place for [the Aisenbergs] to speak about the case."

125.    Upon information and belief, Defendants Burton, Blake, Henderson, Terry, Kunz, Bedke, and Brown informed reporters that the Aisenbergs were scheduled to appear before the federal grand jury on February 11, 1998.

126.    Throughout the investigation Defendant Brown misleadingly told reporters that the Aisenbergs were not cooperating with law enforcement and had never submitted to interviews once they had hired attorneys.

127.    On or about September 23, 2002, Defendant Brown, visiting a high school journalism class, stated that if reporters knew 25 percent of what the Sheriff knew about the investigation into Sabrina's disappearance then the public would realize that Steven and Marlene Aisenberg were responsible for her disappearance.

128.    The Defendants' efforts in disseminating misleading and prejudicial information were designed to influence the jury pool in the Middle District of Florida with fabricated information which would be irrelevant or inadmissible at trial.

58



## KNOWN PROBLEMS WITH AUDIBILITY
## OF INTERCEPTED COMMUNICATIONS

129.    From the outset of the oral intercept, Defendants and others unknown were aware of the absence of incriminating information as alleged in the Oral Intercept Applications and elsewhere due to the inaudibility of the conversations surreptitiously recorded.

130.    Beginning in December, 1997, Defendants delivered or caused to be delivered to the FBI Laboratory in Washington, D.C., by hand and otherwise, tapes of conversations intercepted during the Oral Intercept for processing and enhancement.

131.    From on or about December 29, 1997 to June 6, 1999, Defendants delivered or caused to be delivered over 50 audiotapes for analysis. Included in those audiotapes were conversations related to Exhibits C, D, E, F, G, and J to the First Extension, Exhibits M, T, U, and W to the Second Extension, and Overt Acts 32, 33, 34, 45, 46, 47, 48 and 53. These Overt Acts and extension exhibits contain the most prejudicial and inflammatory allegations in the Indictment and Oral Intercept Applications.

132.    Defendants Kunz and Bedke were aware of the audibility problems with the recordings made during the oral intercept.

> A.    Simultaneous to analysis being completed by the FBI Laboratory of these tapes, information regarding the poor quality of the recordings and inability to improve the sound quality was communicated to the Defendants.
>
> B.    On or about February 24, 1999, Defendant Kunz sought to have a judge delay notice to interceptees that their conversations had been surreptitiously recorded and wrote: "In addition, the quality of many of these tape recordings has necessitated that the tape recordings be submitted to an audio laboratory to clarify the conversations by eliminating background noise. This process is ongoing."

C.  On or about May 26, 1999, Defendant Kunz sought again to have a judge delay notice to interceptees and wrote: "[H]owever, the quality of many of these tape recordings has necessitated that the tape recordings be submitted to an audio laboratory to clarify the conversations by eliminating background noise. To date, ten tape recordings have been delivered to the Federal Bureau of Investigation Laboratory in Washington, D.C. for enhancement of the conversations and deletion, wherever possible, of extraneous background noises. An additional twenty tape recordings will also need to be submitted to the FBI laboratory and analyzed during the next several months."

133.   Defendants Kunz, Bedke, Burton, Blake, Terry, Henderson, and Bullara were all aware that the tape recordings of intercepted communications were inaudible and did not contain any allegedly incriminating statements.

## FEDERAL CRIMINAL PROCESS

134.   Attorneys within the Hillsborough County State Attorney Office reviewed the fruits of the oral intercept and other "evidence" collected during the investigation and decided that there was insufficient evidence to believe the Aisenbergs had committed any crime and that the tape recordings did not incriminate the Aisenbergs as had been represented by the Defendants.

135.   On September 9, 1999, approximately twenty-one months after Sabrina's disappearance and about eighteen months after discontinuation of the state-authorized interception in the Aisenbergs' home, a federal grand jury returned a twenty-seven page, seven-count indictment alleging (1) that both in the Aisenbergs' initial report and during the consequent investigation the Aisenbergs violated 18 U.S.C. §§ 1001 and 2 by, among other things, uttering "false, fictitious, or fraudulent statements" to law enforcement respecting Sabrina's disappearance and (2) that the Aisenbergs conspired to effect the deceptions that violated Sections 1001 and 2.

136.   On September 9, 1999, a press conference was held in the offices of the United States Attorney for the Middle District of Florida to announce the return of the indictment.





A.   The press conference was attended by, among others Defendants Henderson, Kunz, Bedke, and Terry.

B.   At the press conference, it was announced that the Aisenbergs "lied to enforcement authorities concerning the circumstances surrounding the baby's disappearance and their reaction to it, as well as the condition of the baby at the time of the reported kidnaping [and] discussed on several occasions that the baby was actually dead and what story they would tell authorities concerning the disappearance of the baby."

C.   Also during the press conference, Defendant Henderson stated: "The information in the indictment would indicate that the child is not alive, but they've lied to us in the past, we can't say - we don't know."

D.   The information announced at the press conference came as the result of lies and false statements created by Defendants Kunz and Bedke and included in the indictment which was returned by the grand jury which had been the subject of the repeated abuse by the Defendants.

137.   The Indictment, written by Defendants Kunz and Bedke, focuses on alleged intercepted conversations intercepted during the electronic surveillance of the Aisenbergs and recklessly and corruptly misrepresents the context of those conversations. Several paragraphs of the indictment purport to quote incriminating statements attributed to the Aisenbergs. For example,

A.   Overt Act 32 alleges that:

On or about December 23, 1997, at approximately 7:20 p.m., MARLENE J. AISENBERG and STEVEN B. AISENBERG discussed the death of Baby Sabrina and possible stories that they could tell the police about how they came up with the kidnapping story. MARLENE J. AISENBERG then told STEVEN B. AISENBERG, "The baby's dead and buried! It was found dead because you did it! The baby's dead no matter what you say -- you just did it!"

B.   Overt Act 33 alleges that:

On or about December 23, 1997, at approximately 7:20 p.m., STEVEN B. AISENBERG replied, "Honey, there was nothing I could do about it. We need to discuss the way that we can beat the charge.

61

PL



I would never break from the family pact and our story even if the police were to hold me down. We will do what we have to do."

C.    Overt Act 36 alleges that:

On or about December 24, 1997, at approximately 11:20 p.m., STEVEN B. AISENBERG and MARLENE J. AISENBERG discussed the possibility of neighbors being witnesses against STEVEN B. AISENBERG. STEVEN B. AISENBERG told MARLENE J. AISENBERG, "They can't hang me, the other four neighbors. They can't hang me unless you attack me before the evidence."

D.    Overt Act 37 alleges that:

On or about December 24, 1997, at approximately 11:20 p.m., MARLENE J. AISENBERG stated, "Oh, Steve! I tried to save her, she died and ah we can't confuse them, but we'll try it Hon, you know." MARLENE J. AISENBERG further stated, "I don't think I have to wait for Joe Sarge to take me to jail . . . ." STEVEN B. AISENBERG replied, "None of us expects that, I don't expect that to happen . . . ." Then STEVEN B. AISENBERG and MARLENE J. AISENBERG discussed their "time-line goof up."

E.    Overt Act 47 alleges that:

On or about January 21, 1998, at approximately 9:00 p.m., STEVEN B. AISENBERG told MARLENE J. AISENBERG, "I wish I hadn't harmed her."

F.    Overt Act 48 alleges that:

On or about January 21, 1998, at approximately 9:00 p.m., MARLENE J. AISENBERG told STEVEN B. AISENBERG, "I just can't take the rap for this."

G.    Overt Act 53 alleges that:

On or about February 10, 1998, MARLENE J. AISENBERG told STEPHEN B. AISENBERG that she was concerned about what a friend of hers would tell the federal grand jury concerning what MARLENE J. AISENBERG had told her friend the morning Baby Sabrina was reported missing. Later, STEVEN B. AISENBERG told MARLENE J. AISENBERG, "We're in hot water thanks to you."

62

PL



> MARLENE J. AISENBERG replied that if the police indicated that the police know where Sabrina is, "I guess we'll just tell that, that they know Sabrina is out there in the water and they have to stay looking for her . . . ."

H.    Overt Act 54 alleges that:

> On or about February 17, 1998, STEVEN B. AISENBERG and MARLENE J. AISENBERG discussed the Baby Sabrina situation, and the fact that "HRS" and the federal grand jury were still attempting to obtain proof. STEVEN B. AISENBERG told MARLENE J. AISENBERG, "They don't know the truth, right?", to which MARLENE J. AISENBERG responded, "Yeah." MARLENE J. AISENBERG further told STEVEN B. AISENBERG, "So, so in a way, you know, that means nobody knows what we did still." STEVEN B. AISENBERG replied, "Exactly."

138.    The indictment was designed to convey two conclusions: (1) that Steven Aisenberg was responsible for the death of Sabrina by some unknown circumstance; and (2) Marlene Aisenberg was assisting her husband in covering up the facts from authorities.

139.    Almost immediately after undersigned counsel appeared in court on behalf of the Aisenbergs, Defendants Kunz and Bedke sought to disqualify counsel and compel retention of separate, attorneys. While the United States argued its concern for the rights of the Aisenbergs, its true purpose in seeking disqualification of defense counsel was to further oppress, threaten, and isolate the Aisenbergs.

140.    During pre-trial proceedings, the Aisenbergs challenged the conduct of prosecutors and investigators by filing numerous motions, including, but not limited to:

A.    Motion to Suppress Electronic Surveillance;

B.    Motion to Dismiss the Indictment, or, in the alternative, to Suppress the Intercepted Communications on the Grounds of Illegal Disclosure of Intercepted Communications;

*PL*



C.   Motion for Audibility Hearing and Identity of Tape Recorded Conversations the Government Intends to Use in it Case In Chief;

D.   Motion to Compel Immediate and Continuous Disclosure of *Brady* Material; and

E.   Motion for Production of Grand Jury Minutes and for Hearing to Determine Whether to Dismiss the Indictment for Investigative and Prosecutorial Misconduct.

141.   Over the objections of Defendants Kunz and Bedke, the Court scheduled the following hearings:

A.   An audibility hearing in order to permit the court to make an independent judicial determination of the audibility of the intercepted conversations the government intended to introduce into evidence in its case in chief;

B.   A hearing to permit the Plaintiffs to prove that the Defendants had obtained an pursued the electronic surveillance through a pattern of lies and deception.

142.   Defendants Kunz and Bedke repeatedly assured the courts that they had listened to the audiotapes and could hear the allegedly incriminating conversations.  For example,

A.   During the Aisenbergs' initial appearance, Defendant Bedke told the district court in Maryland, that "The Government has in its possession a taped statement in which Stephen Aisenberg (sic) states, among other things, "I wish I hadn't harmed her. It was the cocaine." The Government also has, Your Honor, other taped statements of both Steven Aisenberg and Marlene Aisenberg that indicate, based on the quality of their statements and their behavior, that — you can hear that they are drugged."

B.   In the United States' Notice to the Defendants and the Court, Defendants Kunz and Bedke wrote: "The Government's position is that a tape recording does exist which contains the conversation disputed by the defendants."

C.   In the United States' Opposition to Revised Request for Independent Determination of Veracity of Government Representations that Recordings Exist, Defendants Kunz and Bedke wrote: "The government emphatically disputes both the defendants' version of the recorded conversation in question and the outrageous suggestion that the government has made any misrepresentations to the Court" and "The government stands behind the

64



accuracy of its representations concerning the content of the tape recording in question. Government agents have reviewed the tape (along with all of the other tapes) extensively, and they have prepared the transcript submitted to the Court on January 5, 2000. The government prosecutors in this case have also reviewed the tape recording and concur in the transcript prepared by the agents."

D.    During a pre-trial hearing in the criminal matter on March 31, 2000, Defendant Bedke stated: "We obviously understand that these transcripts that we will be required to disclose are going to be trial exhibits and that they need to be perfect, or as close to perfect as the government can make them. So the agents have been working diligently to make them perfect, Your Honor. . . . And the lawyers are obligated, Mr. Kunz and I, to review those transcripts with the tapes, to make sure that we feel comfortable that that task has been accomplished" and "It is Mr. Kunz and I, Your Honor, and the agents investigating this case, that are working on these tapes and transcripts. We don't have an army of people of people that you see on this side, listening to these tapes. We don't have a new lawyer that was just hired to do nothing but listen to tapes and try and prepare defense transcripts, as Mr. Cohen has reported to the court and in the motion he filed this morning has said he has done."

143.    After the court announced its intention to conduct an audibility hearing and after the Defendants learned that the Plaintiffs had retained the services of a world renowned expert Bruce Koenig in the field of forensic audiotape examination, a former Supervisory Special Agent in the Engineering Section of Federal Bureau of Investigation (FBI), Defendants Kunz and Bedke sought and located their own purported "expert" to assist them in furthering their false claim that the inaudible tapes obtained through the oral interception were in fact audible.

144.    In order to perpetuate the lies contained in the Extension Applications for Oral Interception and in the Indictment that incriminating conversations of the Aisenbergs had been captured during the Defendants' investigation, the Defendants fabricated evidence in the following manner:



A.    Defendants Kunz and Bedke drafted the transcripts knowing or in reckless disregard for the fact that the conversations allegedly reflected in the transcripts could not be heard.

B.    Defendants Kunz and Bedke found a purported "expert", Defendant Anthony Pellicano, to support their version of the conversations and the accuracy of their transcripts. Defendant Pellicano, indicted on federal weapons charges in 2002, had no formal training in audiotape examinations and no formal schooling, in fact he dropped out of high school. The district court considered the $350 per hour the Defendants spent in retaining Defendant Pellicano a "surprisingly generous rate given Pellicano's credentials."

C.    Further, Defendants chose Defendant Pellicano because he was willing to fabricate evidence that the Defendants Kunz, Bedke and Pellicano reasonably believed would be introduced at hearings and the trial of the Aisenbergs.

D.    Defendants chose Defendant Pellicano over the FBI and all other available state and federal forensic laboratories because they knew that no other reputable authority would agree to support their endeavor to deceive the district court and a potential jury pool in an effort to deny the Aisenbergs due process of law.

E.    To justify choosing Defendant Pellicano over the FBI audio lab, Defendants Kunz and Bedke alleged in pleadings that "the FBI laboratory analyst who had examined some of the recordings either did not have the time, equipment. experience or training - or simply did not take the time and/or expend the effort - necessary to properly enhance each part of each recording."

F.    Defendant Pellicano corruptly transcribed several conversations in anticipation of hearings before the court in that he corroborated Defendants' false versions of the contents of the intercepted conversations.

145.    On or about February 14, 2001, Magistrate Judge hearing the matter recommended that the Aisenbergs' Motion to Suppress Electronic Surveillance be granted on several grounds.

A.    The Judge found that Defendants Burton and Blake intentionally or recklessly made false and misleading statements and omissions in the oral intercept applications which, when the false and misleading statements were removed from the applications, rendered them void of probable cause.

66

 

B.    The Judge found that Defendants Burton and Blake included in the applications for oral intercept requests to intercept conversations concerning crimes which are not enumerated in the statute governing the interception of communications.

C.    The Judge found that Defendants Burton and Blake misled Judge Alvarez when they stated in the Original Application, the First Extension and the Second Extension that normal investigative procedures had been tried and had failed.

146.    On February 21, 2001, the government filed a Motion for Leave to File a Dismissal as to Steven Aisenberg and Marlene Aisenberg.

147.    On or about February 22, 2001, the Court granted the government's Motion for Leave to File a Dismissal and dismissed the indictment against Steven Aisenberg and Marlene Aisenberg.

## PLAINTIFFS' HYDE AMENDMENT PETITION

148.    After the indictment was dismissed, Plaintiffs filed their Petition for Attorneys' Fees and Costs Pursuant to the Hyde Amendment based on their frivolous, vexatious, and bad faith prosecution. (the "Hyde Amendment Petition")

149.    In an unprecedented decision, the United States conceded that the prosecution of the Aisenbergs was brought frivolously, vexatiously and in bad faith contesting only the manner in which reasonable fees should be calculated.

150.    On or about January 31, 2003, the court issued an order granting the Aisenbergs reimbursement of a "reasonable attorneys' fee" and requiring the United States to make all grand jury transcripts public.

151.    The court commented on the poor quality of the intercepted conversations Defendants Kunz and Bedke intended to introduce in evidence at trial stating:



"Before the September 28, 2000, hearing, I had thoroughly reviewed the thirty-two compact discs intended for use by the United States as evidence against the Aisenbergs at trial. I had played each disc in sequence until completion. As I reviewed the recordings, I recalled that the United States had expressed repeatedly that the recordings were the motive force and principal support for its case against the Aisenbergs. The lengthy indictment included strongly inculpatory quotations attributed to the Aisenbergs, quotations avowedly derived from the thirty-two compact discs and prominently featured by the United States at a conspicuous news conference held to announce the indictment a year earlier. But after careful review, I heard none of it. I heard many audible utterances, none of them decidedly and reliably inculpatory." Hyde Petition Order, pg. 17.

152. The court also commented on the quality of the transcripts prepared by Defendants Kunz and Bedke, stating:

"I promptly began another extended review of the recordings, now employing the transcripts provided by the United States and the Aisenbergs. I listened to the recordings and compared what I heard with the transcripts provided by the United States. *The disparity was shocking.*" Hyde Petition Order, pg. 17 (emphasis added).

153. The court conducted a detailed review of the pleadings and *Franks* hearing transcripts, as well as the Magistrate Judge's Report and Recommendation, and found "no misapprehension by the magistrate judge of either fact or law and no basis on which to disagree with his studied conclusions." Hyde Petition Order, pg. 21.

154. The court "join[ed] the magistrate judge in each of his words" and incorporated the Magistrate Judge's Report and Recommendation "by reference in its entirety" to the order. Hyde Petition Order, pg. 20.

## RELATED INVESTIGATIONS

155. On or about February 22, 2001, Florida Governor Jeb Bush, as a result of the Report and Recommendation issued by the Magistrate Judge, issued Executive Order Number 01-64





appointing State Attorney Norman Wolfinger to investigate the conduct of Defendants Linda Burton and William Blake.

156.    On or about December 19, 2001, State Attorney Wolfinger reported that:

> "After reviewing the FDLE investigation; reviewing all the documentation surrounding the oral intercept and subsequent hearing; focusing on the procedures that were followed in conducting the intercept and in the subsequent review of "state attorney" tapes; examining the tapes and the development of all versions of tape transcripts; and reviewing the FDLE interviews of persons who were directly involved in that process, there is nothing to support that Detectives Linda Burton and William Blake have committed any crime. Likewise, there is no evidence to support that those above Detectives Burton and Blake in the command structure committed any crime or caused any person to falsify their testimony or report."

157.    On or about January 3, 2002, the HCSO began an internal affairs investigation to determine if its policies or procedures were violated during the Oral Intercept portion of the investigation of Steven and Marlene Aisenberg.

158.    As a result of that investigation:

A.    Defendant Major Gary Terry, as Task Force Commander of the Sabrina Aisenberg investigation, received a letter of reprimand for failing to make certain there was proper supervision and oversight of investigation procedures, reporting and documentation.

B.    Defendant Linda Burton, as Affiant of the application for Oral Intercept, received a letter of reprimand for failing to learn and follow the legal requirements necessary for the investigation and for failing to notify her supervisors of discrepancies she noticed in the applications for oral intercepts.

C.    Defendant William Blake, as Affiant of the application for Oral Intercept, received a letter of reprimand for failing to learn and follow the legal requirements necessary for the investigation and for failing to notify his supervisors of discrepancies he noticed in the applications for oral intercepts.

69

PL

## CAUSES OF ACTION

## FEDERAL CONSTITUTIONAL CLAIMS

## COUNT I: 42 U.S.C. § 1983

**MATERIAL MISREPRESENTATIONS IN APPLICATIONS FOR
ORDER PERMITTING INTERCEPT OF ORAL COMMUNICATIONS IN VIOLATION
OF FOURTH AND FOURTEENTH AMENDMENTS**
Defendants Burton, Blake, Terry, Henderson, Bullara,
Roman, Somellan, Olmeda, Dubord, Diaz,
Enriquez, Ford, Orgeron, Chronister

159.    Plaintiffs reallege and reaffirm paragraphs 1 through 158.

160.    Plaintiffs have a clearly established constitutional right to be from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

161.    Defendants acted under color of state law when they applied for and conducted the interception of oral communications between Marlene Aisenberg and Steven Aisenberg.

162.    Defendants made material misrepresentations and omissions in the Original Application, First Extension and Second Extension which were the product of deliberate falsehoods or of reckless disregard for the truth which are more fully described in paragraphs 64 through 99 of this complaint.

163.    If the material misrepresentations and omissions, made deliberately or with a reckless disregard for the truth, are removed, the Original Application would have been denied due to a lack of probable cause.

70

PL

164.    If the material misrepresentations and omissions, made deliberately or with a reckless disregard for the truth, are removed, the First Extension would have been denied due to a lack of probable cause.

165.    If the material misrepresentations and omissions, made deliberately or with a reckless disregard for the truth, are removed, the Second Extension would have been denied due to a lack of probable cause.

166.    A reasonable official would understand that making deliberate or reckless misrepresentations in an application to intercept oral communications violates the Fourth and Fourteenth Amendments. The Defendants' conduct lies so obviously at the very core of what the Constitution prohibits that the unlawfulness of the conduct was readily apparent to the Defendants.

167.    These material and deliberate misrepresentations and omissions deprived the Plaintiffs of their right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments.

168.    Defendants Burton and Blake were the affiants of the Application and Extensions to Intercept the Oral Communications of the Plaintiffs.

169.    Defendants Terry, Henderson and Bullara were Defendants Burton's and Blake's supervisors and aided and abetted in the creation, development and submission of the Application and Extensions to Intercept the Oral Communications of the Plaintiffs.

170.    Defendant Roman drafted the Second Extension Application.

171.    Defendants Olmeda, Dubord, Diaz, Enriquez, Ford, Orgeron and Chronister were the monitors and transcribers of the conversations which were falsely represented in transcripts

71

PL

presented to the court in order to obtain an Order Authorizing the continued interception of oral communications of the Aisenbergs.

172.    Plaintiffs suffered damages as a result of Defendants' conduct.

173.    Plaintiffs have performed all conditions precedent to be performed or the conditions have occurred.

WHEREFORE, Plaintiffs, STEVEN AISENBERG AND MARLENE AISENBERG, demand judgment for damages against Defendants, exemplary damages, costs of this action, and such other and further relief as the Court deems appropriate.  Plaintiffs demand trial by jury.

## COUNT II: *BIVENS* ACTION

### MATERIAL MISREPRESENTATIONS IN APPLICATIONS FOR ORDER PERMITTING INTERCEPT OF ORAL COMMUNICATIONS IN VIOLATION OF FOURTH AMENDMENT
Defendants Kunz and Bedke

174.    Plaintiffs reallege and reaffirm paragraphs 1 through 158.

175.    Plaintiffs have a clearly established constitutional right to be from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution.

176.    Defendants Kunz and Bedke acted under color of authority when they aided and abetted Defendants Burton and Blake in applying for and conducting the interception of oral communications between Marlene Aisenberg and Steven Aisenberg.

177.    Defendants Kunz and Bedke assisted and advised Burton and Blake in making material misrepresentations or omissions in the Original Application, First Extension and Second Extension which were the product of deliberate falsehoods or of reckless disregard for truth which are more fully described in paragraphs 64 through 99 of this complaint.

72

*PL*

178.   If the material misrepresentations and omissions, made deliberately or with a reckless disregard for the truth, are removed, the Original Application would have been denied due to a lack of probable cause.

179.   If the material misrepresentations and omissions, made deliberately or with a reckless disregard for the truth, are removed, the First Extension would have been denied due to a lack of probable cause.

180.   If the material misrepresentations and omissions, made deliberately or with a reckless disregard for the truth, are removed, the Second Extension would have been denied due to a lack of probable cause.

181.   A reasonable official would understand that making deliberate or reckless misrepresentations in an application to intercept oral communications violates the Fourth and Fourteenth Amendments. The Defendants' conduct lies so obviously at the very core of what the Constitution prohibits that the unlawfulness of the conduct was readily apparent to the Defendants.

182.   The material and deliberate misrepresentations deprived the Plaintiffs of their right to be free from unreasonable searches and seizures under the Fourth Amendment.

183.   Plaintiffs suffered damages as a result of Defendants' conduct.

184.   Plaintiffs have performed all conditions precedents to be performed or the conditions have occurred.

WHEREFORE, Plaintiffs, STEVEN AISENBERG AND MARLENE AISENBERG, demand judgment for damages against Defendants, exemplary damages, costs of this action, and such other and further relief as the Court deems appropriate. Plaintiffs demand trial by jury.

73

*PL*

## COUNT III: 42 U.S.C. § 1983

### FABRICATION OF EVIDENCE AND MALICIOUS PROSECUTION
### IN VIOLATION OF THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS
Defendants  Burton, Blake, Terry, Henderson, Bullara, Roman, Somellan, Olmeda, Dubord, Diaz, Brown, Enriquez, Ford, Orgeron, Bryant, Williams, Chronister

185.    Plaintiffs reallege and reaffirm paragraphs 1 through 158.

186.    The Plaintiffs have a clearly established right under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution to be free from unreasonable and unlawful seizures caused by criminal charges on the basis of false or deliberately fabricated evidence and not to be subjected to criminal charges based on false or deliberately fabricated evidence.

187.    On or about September 9, 1999, Plaintiffs were indicted in the United States District Court for the Middle District of Florida for alleged violations of 18 U.S.C. § 371, conspiracy, and 18 U.S.C. § 1001, false statements to a federal agency.

188.    The Plaintiffs were arrested and subjected to actual, unlawful, and forcible restraint of their persons.

189.    The criminal proceeding was dismissed on or about February 21, 2001.  This termination was a bona fide termination in favor of the Plaintiffs.

190.    The Defendants were the legal cause of the criminal proceeding against the Plaintiffs.

191.    There was an absence of probable cause for the initiation of criminal charges against the Plaintiffs.

192.    The Defendants acted with malice when they caused the indictment to be returned.

193.    Defendants deliberately fabricated false evidence which was used to subject the Plaintiffs to criminal charges:

74

*PL*

A.  Defendants Burton, Blake, Terry, Bullara, Henderson and others fabricated evidence that the Plaintiffs had abused their daughter, Sabrina Aisenberg;

B.  Defendants Burton, Blake, Terry, Henderson, Bullara, Roman, Olmeda, Dubord, Diaz, Enriquez, Ford, Orgeron, and Chronister fabricated evidence that Aisenbergs repeatedly incriminated themselves in electronically intercepted conversations as described infra;

C.  Defendants Henderson, Terry, Bullara, Burton, Blake and Brown fabricated the relevance and materiality of leads and evidence in an effort to tarnish the public perception of the Plaintiffs; and

D.  Defendant Somellan extracted still images from the November 22, 1997 videotape of Sabrina Aisenberg which misrepresented the true nature of Sabrina Aisenberg's physical condition.

194.  The Defendants were acting under the color of state law at the time they fabricated the evidence and used it to subject the Plaintiffs to criminal charges. If this fabricated evidence had not been presented to the grand jury the Plaintiffs would not have been indicted and arrested.

195.  The Defendants fabricated evidence implicating the Aisenbergs in the disappearance of Sabrina even though they knew or should have know that the Aisenbergs were innocent. The Defendants also used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

196.  The fabrication of evidence and the resulting arrest of the Plaintiffs deprived the Plaintiffs of their right to be free from unreasonable seizures and not to be subjected to criminal charges based on false or deliberately fabricated evidence under the Fourth, Fifth and Fourteenth Amendments.

197.  Plaintiffs suffered damages as a result of Defendants' conduct.

198.  Plaintiffs have performed all conditions precedents to be performed or the conditions have occurred.

75

*PL*

 

WHEREFORE, Plaintiffs, STEVEN AISENBERG AND MARLENE AISENBERG, demand judgment for damages against Defendants, exemplary damages, costs of this action, and such other and further relief as the Court deems appropriate. Plaintiffs demand trial by jury.

**COUNT IV: *BIVENS* ACTION**

**FABRICATION OF EVIDENCE IN VIOLATION OF
THE FOURTH AND FIFTH AMENDMENTS**
Defendants Kunz, Bedke and Pellicano

199. Plaintiffs reallege and reaffirm paragraphs 1 through 158.

200. The Plaintiffs have a clearly established right pursuant to the Fourth and Fifth Amendments of the United States Constitution to be free from unreasonable and unlawful seizures caused by criminal charges based on false or deliberately fabricated evidence and not to be subjected to criminal charges on the basis of false or deliberately fabricated evidence.

201. On or about September 9, 1999, Plaintiffs were indicted in the United States District Court for the Middle District of Florida for alleged violations of 18 U.S.C. § 371, conspiracy, and 18 U.S.C. § 1001, false statements to a federal agency.

202. Defendants deliberately fabricated false evidence which was used to subject the Plaintiffs to criminal charges:

        A.      Defendants fabricated evidence that the Plaintiffs had abused their daughter, Sabrina Aisenberg; and

        B.      Defendants fabricated evidence that electronically intercepted conversations of the Plaintiffs inculpated them in the disappearance of their daughter.

203. Some of this evidence was presented to the grand jury at a time when the grand jury was an investigative body and the Defendants did not have probable cause to arrest the Plaintiffs.

76

204.    The Defendants drafted transcripts of intercepted conversations which the Defendants intended to introduce at trial.

205.    The transcripts were submitted to the United States District Court for the Middle District of Florida by Defendants Kunz and Bedke in an effort to influence the manner in which the court would consider intercepted communications.

206.    Defendants Kunz and Bedke located and hired purported "expert" Defendant Anthony Pellicano to support the accuracy of the transcripts they prepared.

207.    The transcripts prepared by the Defendants were deliberately false and intentionally inaccurate.

208.    Defendants deliberately fabricated the transcripts to subject the Plaintiffs to criminal charges based on conversations which falsely asserted that the Plaintiffs made statements inculpating them in the disappearance of their daughter.

209.    Defendants Kunz and Bedke continued their investigation despite the fact that they knew or should have known that the Aisenbergs were innocent. Defendants Kunz and Bedke used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

210.    The Defendants were acting under the color of authority at the time they fabricated this evidence and used it to subject the Plaintiffs to criminal charges. If this fabricated evidence had not been presented to the grand jury the Plaintiffs would not have been indicted and arrested.

211.    The fabrication of evidence deprived the Plaintiffs their constitutional rights under the Fourth Amendment of the United States Constitution.

212.    Plaintiffs suffered damages as a result of Defendants' conduct.

77



213.    Plaintiffs have performed all conditions precedents to be performed or the conditions have occurred.

WHEREFORE, Plaintiffs, STEVEN AISENBERG AND MARLENE AISENBERG, demand judgment for damages against Defendants, exemplary damages, costs of this action, and such other and further relief as the Court deems appropriate.  Plaintiffs demand trial by jury.

### COUNT V: 42 U.S.C. § 1983 - CONSPIRACY
### All Defendants

214.    Plaintiffs reallege and reaffirm paragraphs 1 through 158.

215.    Defendants reached an understanding to deny the Plaintiffs their rights under the Fourth Amendment to be free from unreasonable searches and seizures caused by criminal charges based on false or deliberately fabricated evidence and their right under the Fifth Amendment not to be subjected to criminal charges based on false or fabricated evidence.

216.    Defendants committed several overt acts in furtherance of the conspiracy, including:

    A.    Applying for orders to intercept the Plaintiffs' oral communications with intentionally and recklessly false and misleading affidavits;

    B.    Fabricating transcripts of intercepted communications which misrepresented the audibility and context of the conversations;

    C.    Fabricating evidence that the Plaintiffs physically and sexually abused their children;

    D.    Improperly leaking information about the Plaintiffs and the investigation to the public; and

    E.    Conducting superficial investigations into the conduct of those responsible for the abusive investigative and prosecutorial conduct discussed herein.

218.    Defendants Kunz and Bedke joined this conspiratorial agreement and took actions in furtherance of it while they were acting in an investigative role.

78

*PL*



217. The Plaintiffs were damaged as a result of the acts done in furtherance of the conspiracy.

218. Plaintiffs have performed all conditions precedents to be performed or the conditions have occurred.

WHEREFORE, Plaintiffs, STEVEN AISENBERG AND MARLENE AISENBERG, demand judgment for damages against Defendants, exemplary damages, costs of this action, and such other and further relief as the Court deems appropriate. Plaintiffs demand trial by jury.

### COUNT VI: 42 U.S.C. § 1983

### POLICY, PRACTICE OR PROCEDURE
Defendants HCSO, Henderson, Terry

219. Plaintiffs reallege and reaffirm paragraphs 1 through 158.

220. Defendant, HCSO, has a policy, practice and/or custom which:

    A.    Permits the development and use of false and fabricated evidence to charge individuals with criminal conduct.

    B.    Permits employees to intentionally or with reckless disregard for the truth to misrepresent material facts in applications to intercept oral communications.

221. This policy, practice, or custom of Defendant HCSO caused a violation of the Plaintiffs' constitutional rights under the Fourth Amendment to be free from unreasonable searches and seizures caused by criminal charges based on false or deliberately fabricated evidence and under the Fifth Amendment not to be subjected to criminal charges on false or deliberately fabricated evidence.

79

$P_L$

222.    Defendant HCSO knew or should have known that its officers were fabricating evidence making material false statements in search warrant applications and approved, acquiesced, and/or encouraged these alleged unconstitutional actions.

223.    This policy was implemented and controlled by Defendants Henderson and Terry who are policy makers of the HCSO.

224.    Defendants HCSO, Henderson and Terry were deliberately indifferent to the fact that this policy would deprive the Plaintiffs of their Fourth Amendment right to be free from unreasonable searches and seizures and their Fifth Amendment right not to be subjected to criminal charges based on false or deliberately fabricated evidence.

225.    Defendants HCSO, Henderson and Terry failed to adequately punish the HCSO employees responsible for developing and using false and fabricated evidence to charge individuals with criminal conduct.

226.    This policy or custom was the moving force behind the violation of Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures and Fifth Amendment right not to be subjected to criminal charges based on false or deliberately fabricated evidence and Plaintiffs were damaged as a result.

227.    Plaintiffs have performed all conditions precedents to be performed or the conditions have occurred.

WHEREFORE, Plaintiffs, STEVEN AISENBERG AND MARLENE AISENBERG, demand judgment for damages against Defendants, exemplary damages, costs of this action, and such other and further relief as the Court deems appropriate. Plaintiffs demand trial by jury.

80



## COUNT VII: 42 U.S.C. § 1983

### FAILURE TO TRAIN AND/OR SUPERVISE
Defendant HCSO, Henderson, Terry, Bullara



228.   Plaintiffs reallege and reaffirm paragraphs 1 through 158.

229.   Defendants HCSO, Henderson, Terry and Bullara failed to adequately train and/or supervise the defendant HCSO employees in the proper operation of an electronic oral intercept.

228.   The need for such training was plainly obvious to HCSO policymakers.

230.   This failure to train was an official policy, practice and procedure of the HCSO.

231.   This failure to train caused the HCSO defendant employees to violate the Plaintiffs' rights under the Fourth Amendment to be free from unreasonable searches and seizures and under the Fifth Amendment not to be subjected to criminal charges based on false or deliberately fabricated evidence.

232.   The Defendants were deliberately indifferent to the rights of persons whose conversation was intercepted.

233.   The Plaintiffs suffered damages as a result of the Defendants' conduct.

234.   Plaintiffs have performed all conditions precedents to be performed or the conditions have occurred.

WHEREFORE, Plaintiffs, STEVEN AISENBERG AND MARLENE AISENBERG, demand judgment for damages against Defendants, exemplary damages, costs of this action, and such other and further relief as the Court deems appropriate. Plaintiffs demand trial by jury.

*PL*



## STATE LAW CLAIMS

### COUNT VIII: DEFAMATION
Defendant Brown

235. Plaintiffs reallege and reaffirm paragraphs 1 through 158.

236. Defendant Brown, on or about September 23, 2002, while speaking to a high school journalism class, stated "that if reporters knew 25 percent of what the Sheriff knew about the investigation into Sabrina's disappearance then the public would realize that Steven and Marlene Aisenberg were responsible for her disappearance."

237. Defendant Brown's statement was false and defamatory concerning Plaintiffs.

238. Defendant Brown did not use reasonable care to ascertain the truth or falsity of that statement.

239. Plaintiffs suffered damages as a result of the defamatory statement made by Defendant Brown.

240. Plaintiffs have performed all conditions precedents to be performed or the conditions have occurred.

WHEREFORE, Plaintiffs, STEVEN AISENBERG AND MARLENE AISENBERG, demand judgment for damages against Defendants, exemplary damages, costs of this action, and such other and further relief as the Court deems appropriate. Plaintiffs demand trial by jury.

### COUNT IX: MALICIOUS PROSECUTION
Burton, Blake, Henderson, Terry, Bullara, Brown, Roman, Somellan,
Olmeda, Chronister, Dubord, Diaz, Enriquez, Ford and Orgeron

241. Plaintiffs reallege and reaffirm paragraphs 1 through 158.

82

242.    On or about September 9, 1999, a criminal proceeding in United States District Court for the Middle District of Florida against the Plaintiffs was commenced.

243.    Defendants Burton, Blake, Henderson, Terry, Bullara, Brown, Roman, Somellan, Olmeda, Chronister, Dubord, Diaz, Enriquez, Ford and Orgeron were the legal cause of the criminal proceeding against the Plaintiffs.

244.    The criminal proceeding was terminated in favor of the Plaintiffs when the District Court granted the United States' Motion to Dismiss the Indictment.

245.    There was an absence of probable cause for the criminal proceeding.

246.    There was malice on the part of the Defendants.

247.    The Plaintiffs suffered damages as a result of the original proceeding.

248.    Plaintiffs have performed all conditions precedents to be performed or the conditions have occurred.

WHEREFORE, Plaintiffs, STEVEN AISENBERG AND MARLENE AISENBERG, demand judgment for damages against Defendants, exemplary damages, costs of this action, and such other and further relief as the Court deems appropriate. Plaintiffs demand trial by jury.

### COUNT X: INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS
All Defendants

249.    Plaintiffs reallege and reaffirm paragraphs 1 through 158.

250.    Defendants' conduct was intentional or reckless in that they intended their actions when they knew or should have known that their actions would likely cause the Plaintiffs severe emotional distress.

83





251.    The Defendants' conduct was outrageous, i.e. beyond all bounds of decency, atrocious and utterly intolerable in a civilized community.

252.    The Defendants' conduct caused emotional distress to the Plaintiffs.

253.    The Plaintiffs' emotional distress was severe.

254.    Plaintiffs have performed all conditions precedents to be performed or the conditions have occurred.

WHEREFORE, Plaintiffs, STEVEN AISENBERG AND MARLENE AISENBERG, demand judgment for damages against Defendants, exemplary damages, costs of this action, and such other and further relief as the Court deems appropriate.  Plaintiffs demand trial by jury.

DEMAND FOR JURY TRIAL

Plaintiffs, STEVEN AISENBERG and MARLENE AISENBERG, hereby demand trial by jury on all issues herein.

BARRY COHEN
Florida Bar No.: 096478
TODD FOSTER
Florida Bar No.: 0325198
COHEN, JAYSON, & FOSTER, P.A.
201 E. Kennedy Boulevard, Suite 1000
Tampa, Florida 33602
(813) 225-1655
Attorneys for Plaintiffs

